IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | Criminal No.    5:25-CR-424 (BKS) |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ARGENTINA JUAREZ-LOPEZ,** | ) | |
| | ) | |
| | ) | |
| **Defendant** | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT
ARGENTINA JUAREZ-LOPEZ'S MOTION TO SUPPRESS**

Respectfully submitted,

JOHN A. SARCONE III
Acting United States Attorney

/s/ Michael F. Perry
/s/ Michael J. Whalen

By:    _____

Michael F. Perry, Bar Roll No. 518952
Michael J. Whalen, Bar Roll No. 704276
Assistant United States Attorneys

1

# TABLE OF CONTENTS

I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ......................................3

II.    GOVERNING LAW AND STANDARD OF REVIEW ........................................................7

III.   DISCUSSION..................................................................................................................9

   A.   The Administrative Warrant Complies with the Constitution.............................................9

   B.   The Defendant Was Appropriately Detained. ...................................................................15

   C.   The Defendant's Identity Should Not Be Suppressed. ......................................................20

IV.    CONCLUSION ...............................................................................................................25

The Government opposes Defendant Argentina Juarez-Lopez's motion to suppress, Dkt. 23 (hereinafter, the "Motion"), and urges this Court to deny it for the reasons described below.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

During a months-long investigation by Homeland Security Investigations (HSI) and other federal agencies, investigators learned, among other things, that many current and/or former employees of the Nutrition Bar Confectioners production facility in Cato, New York, had used or were using invalid Social Security numbers. *See* Ex. 1.[1] Specifically, based on information obtained from the New York State Department of Labor combined with searches of "Department of Homeland Security databases and public records databases," agents had learned that:

> at least 134 of NUTRITION BAR CONFECTIONERS's 224 employees for the first quarter of 2025 were either using a valid Social Security Number that was not assigned to them, a Social Security Number belonging to a deceased United States citizen or a number that was not a valid Social Security Number issued by the Social Security Administration. Specifically, NUTRITION BAR CONFECTIONERS paid wages to fifty-two (52) employees who were utilizing valid Social Security Numbers that were not assigned to them; twenty-two (22) employees who were utilizing Social Security Numbers of deceased U.S. citizens; and sixty (60) employees who were utilizing invalid Social Security Numbers.

*See* Ex. 1 at 12-13.

Over a several-month period in 2025, agents encountered – and in some cases, arrested – multiple NBC employees who did not have legal status or work authorization in the United States. *See id.* at 3-11. HSI also received multiple anonymous tips complaining that Nutrition Bar hired illegal immigrants at its facility. *See id.* at 11-12.

On August 28, 2025, United States Magistrate Judge Thérèse Wiley Dancks signed two search warrants relating to the Nutrition Bar facility: a standard criminal search warrant under Federal Rule

---

[1] The exhibits attached to this motion, as redacted, are not under seal.

of Criminal Procedure 41, and an administrative warrant.[2] The Rule 41 warrant authorized a search of Nutrition Bar's 60,000 square-foot facility and grounds and the seizure of physical and electronic evidence relating to the employment of unauthorized aliens, identity theft, and the use of false social security numbers. *See* Ex. 2. The administrative warrant authorized law enforcement officers to search Nutrition Bar's facility "for aliens present unlawfully in the United States and for the purpose of taking such actions, with respect to any such aliens present there, as are authorized by law." *See* Ex. 5.

On September 4, 2025, law enforcement officers, including from HSI, U.S. Border Patrol, IRS Criminal Investigation (IRS-CI), and Immigrations and Customs Enforcement (ICE) Enforcement and Removal Operations (ERO), executed the warrants at the Nutrition Bar facility. The agents anticipated that not more than approximately 50-60 employees would be working that day, and approximately 60 agents and officers participated in the operation as a result. *See* Ex. 6 ("McCoy Decl.") ¶ 6. Shortly after arriving on scene, however, agents were informed that approximately 160 employees were working at the plant that day. *Id.* ¶ 8.

After entering the facility, agents wearing basic safety gear began securing the location, which is an important part of evidence preservation and officer safety. *See* McCoy Decl. ¶¶ 4-5. Among other things, this involves entering all rooms, opening all doors, and locating individuals present to keep them (and officers) safe and to make sure the search is not impeded. *Id*. ¶¶ 4-5, 10.

The defendant became aware that "police" had entered the building when she "heard commotion and saw a co-worker that [she] knew running through the production area stating that police had entered the factory." *See* Dkt. 23-16 ("Defendant Decl.") ¶ 5. The defendant left her post and soon encountered a "police officer" who ordered her to "Stop." *Id.* ¶ 6. The defendant disobeyed this

---

[2] Administrative warrants of the type obtained in this case are sometimes referred to as "Blackie's warrants," based on the name of the business involved in the eponymous case. *See Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211 (D.C. Cir. 1981). The administrative warrant application was accompanied by a memorandum of law, Ex. 3, in addition to an affidavit in support, Ex. 4.

instruction and "turned and started walking towards another area of the factory," obeying a subsequent instruction to stop only when she encountered "another police officer." *Id.* ¶ 7. According to the defendant, the officers were wearing their weapons, but she does not allege that any officers pointed their weapons at anybody in the facility or used them during the search. *Id.* ¶¶ 7, 9, 12.[3]

Approximately three minutes after agents entered the building, announcements in English and Spanish were made over the public address system explaining to the employees that a law enforcement search was underway; that the employees should assemble in the production hallway area; and that all equipment should be turned off safely. *See* McCoy Decl. ¶ 9.

The defendant was not the only employee who disobeyed law enforcement instructions. Some hid in bathrooms, and at least one attempted to run away. The runner was handcuffed, *see* Ex. 7 ("Burrell Decl.) ¶ 3, and those who hid in bathrooms (including those who barricaded the door and disobeyed instructions to open it) were allowed to wash their hands before being escorted – without handcuffs – to the area where other workers had assembled, *see* McCoy Decl. ¶ 11. Other workers were allowed, in an orderly line, to hang up the white food production robes they had been wearing. *See* Motion at 5.

The search team searched the entire facility to identify locations where electronic or physical evidence relating to the Rule 41 warrant could be stored. *See* McCoy Decl. ¶¶ 10, 15-16. While most of the records were located toward the front of the facility, as anticipated, some physical records were located in and seized from an upstairs storage room not near the front office. *See id.* ¶ 16. Agents would have secured and searched the entire facility regardless of whether an administrative warrant had been

_____

[3] Curiously, the defendant makes repeated reference to the weaponas and safety vests worn by the officers. *See* Motion at 1, 7, 9, 13, 20, 21. It is indisputable that law enforcement officers are in danger whenever they execute search warrants, *see, e.g.*, Ex. 10 at 4 (report from National Law Enforcement Officers Memorial Fund tallying officer deaths in 2024 from warrants and other law enforcement activities), and their weapons and vests are important safety measures, McCoy Decl. ¶ 4. Ultimately, the agents' possession of weapons and safety equipment at the Nutrition Bar facility is irrelevant to the issues before this Court.

obtained. *See* McCoy Decl. ¶ 14.

Approximately 17 minutes after initial entry into the facility, agents invited U.S. citizens to come forward from among the assembled employees. *See* Motion at 6-7. Those who came forward spoke with agents one by one outside the break room area. *Id.* Employees who claimed to have work permits were also separated as a group. *Id.*

Employees who did not self-identify as citizens or as having work permits remained in the break room. *See id.* (citing body camera footage). They lined up and were questioned, along with those who had separately claimed work permit status. *Id.* Following these interviews, many employees were escorted outside to the transport vans without handcuffs. *See* Ex. 8 ("Mulzoff Decl.") ¶ 3. A few noncompliant males were handcuffed before being escorted to the vans. *Id.*

At the transport vans in the parking lot, agents were asking the detained employees biographical questions and fitting the individuals with soft restraints, which are similar to handcuffs but made out of shoelace-like material, before seating them in vans and transporting them for administrative immigration processing. *See* Mulzoff Decl. ¶¶ 3-5 & Fig. 1; *see also* Burrell Decl. ¶ 4.

While the defendant claims that "all" the employees in the break room were "pushed into a corner of the room," Defendant Decl. ¶ 13, body camera footage confirms that the defendant and others in the break room stood in lines and took turns speaking with agents, *see* Tuck Aff. Ex. 10 at 9:41:14 – 9:44:29; *Id.* Ex. 11 at 9:48:06 to 9:53:01.

The defendant admits that she refused to answer questions about her immigration status. Defendant Decl. ¶¶ 14-15. Her brief questioning inside the break room was captured on body camera from a distance, and during the audible portion of that questioning the Government agrees that the defendant referenced an attorney. Dkt. 23-18 ¶ 5 ("Costa Decl.") (acknowledging that not all of the recorded interaction is intelligible); *see* Ex. 11 at 9:52:44 – 9:52:59. The defendant denies having any further conversations with police officers on site, and she claims that, after leaving the break room, she did not see anyone else speak with officers about their immigration status or places of origin. Defendant

Decl. ¶¶ 16-18. The defendant further claims that when she went outside, she was wrapped with a chain and handcuffed to it for transport. Defendant Decl. ¶ 20. Other than the defendant's claim, there is no evidence that compliant individuals detained at the facility were chained and handcuffed in this manner. *See* Mulzoff Decl. ¶¶ 3-4 & Fig. 1. The only individuals known to have been placed in metal handcuffs ran or resisted. Burrell Decl. ¶ 3; Mulzoff Decl. ¶ 3.[4]

The defendant was transported to the Oswego Border Patrol station for further administrative immigration processing. *See* Defendant Decl. ¶ 21. There, she was processed, including by being photographed and fingerprinted. Defendant Decl. ¶ 24. Four days later, on September 8, 2025, the defendant was charged by criminal complaint with illegal entry after removal, in violation of 8 U.S.C. § 1326. Dkt. 1. She was charged by indictment for the same offense on October 23, 2025. Dkt. 13. She filed the Motion on November 10, 2025. Dkt. 23. The defendant has not moved to dismiss the indictment, nor has she claimed that she was misidentified.

## II.    GOVERNING LAW AND STANDARD OF REVIEW

The Fourth Amendment to the Constitution protects against unreasonable searches and seizures. U.S. Const. amend. IV; *Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013) ("[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike."). In deciding whether a seizure was "unreasonable," the Court determines whether the defendant was seized for purposes of the Fourth Amendment and whether the seizure was justified, taking into account the totality of circumstances. *See United States v. Weaver*, 9 F.4th 129, 138-42 (2d Cir. 2021).

---

[4] Not all of the agents who helped execute the warrants wore body cameras. McCoy Decl. ¶ 7. The government has not identified body camera footage of further conversations between the defendant and law enforcement inside or outside the Nutrition Bar facility. Accordingly, it is impossible to determine by reference to video footage whether the defendant was handcuffed, placed into soft restraints, or allowed (like some detainees) to be transported without restraints. *See* Mulzoff Decl. ¶ 4 (describing how some of the women were transported without restraints). This Court does not need to rule on the specific issue of shackling to deny the Motion, but the defendant's insistence that she was shackled without corroborating evidence is relevant to this Court's determination of her credibility.

"When law enforcement officers execute a search warrant, safety considerations require that they secure the premises, which may include detaining current occupants." *Bailey v. United States*, 568 U.S. 186, 195 (2013). "By taking 'unquestioned command of the situation,' the officers can search without fear that occupants, who are on the premises and able to observe the course of the search, will become disruptive, dangerous, or otherwise frustrate the search." *Id.* (quoting *Michigan v. Summers*, 452 U.S. 692, 703 (1981)). Indeed, "[i]f occupants are permitted to wander around the premises, there is the potential for interference with the execution of the search warrant. They can hide or destroy evidence, seek to distract the officers, or simply get in the way." *Id.* at 197.

The Supreme Court developed the "exclusionary rule" to suppress evidence obtained in violation of the Fourth Amendment to "compel respect for the constitutional guaranty." *Davis v. United States*, 564 U.S. 229, 236 (2011) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). "Exclusion is 'not a personal constitutional right,' nor is it designed to 'redress the injury' occasioned by an unconstitutional search." *Id.* (quoting *Stone v. Powell*, 428 U.S. 465, 486 (1976)). As explained further in *Davis*:

> Real deterrent value is a necessary condition for exclusion, but it is not a sufficient one. The analysis must also account for the substantial social costs generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a last resort. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.
>
> . . . .
>
> When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way.

*Id.* at 237-38 (cleaned up).

Where a law enforcement officer "genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, 'and thus nothing to deter,'" if that reliance is objectively reasonable. *United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (quoting *United States v. Leon*, 468 U.S. 897, 920-21 (1984)).

Further, the Supreme Court has held that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984); *see also United States v. Adegbite*, 846 F.2d 834, 838-39 (2d Cir. 1988) ("[T]he identity of defendants is not suppressible under the exclusionary rule."); *United States v. Guzman-Bruno*, 27 F.3d 420, 422 (9th Cir. 1994) ("[T]he district court did not err when it held that neither Guzman-Bruno's identity nor the records of his previous convictions and deportations could be suppressed as a result of the illegal arrest.").

## III.    DISCUSSION

The defendant raises four principal issues in her Motion, which the Government addresses in turn below.

### A.  The Administrative Warrant Complies with the Constitution.

The Immigration and Nationality Act ("the Act"), 8 U.S.C. § 1101 *et. seq.*, was passed by Congress to restrict illegal immigration into the United States. The Act grants the Department of Homeland Security (DHS) general powers to investigate violations of immigration laws.[5]  Those powers include the authority to question people concerning their immigration status and to arrest,

---

[5] The Homeland Security Act of 2002, Pub. L. No. 107-296, §§ 441, 451, 471; 116 Stat. 2135, 2136-37 (2002), abolished the Immigration and Naturalization Service (INS) and transferred responsibility for immigration enforcement to the Department of Homeland Security.

without a warrant, aliens illegally present in the United States. 8 U.S.C. § 1357.[6]

In addition, the Supreme Court has recognized the need for vigorous enforcement of immigration laws and has sought to strike a balance between that need and individual rights. *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976); and *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975).

In a concurring opinion in *Almedia-Sanchez v. United States*, 413 U.S. 266 (1973), Justice Powell indicated that a showing of probable cause may enable immigration agents to obtain a warrant to assist an investigation in which the immigration agents use their statutory authority to question and detain aliens, *see id*. at 282-85 (Powell, J., concurring) (explaining by way of example that Border Patrol could "obtain advance judicial approval of the decision to conduct roving searches on a particular road or roads for a reasonable period of time").

In other contexts, courts have not hesitated to engage in statutory construction where reasonably necessary to permit administrative agencies to carry out the tasks assigned to them by statute.  For example, in *United States v. Euge*, 444 U.S. 707 (1980), the Court held that while the tax code did not explicitly authorize the IRS to summon individuals to produce certain types of evidence, such authority "is necessary for the effective exercise of the Service's enforcement responsibilities,"

---

[6] 8 U.S.C. § 1357(a) provides in relevant part: "Any officer or employee of the Service authorized under regulations proscribed by the Attorney General shall have the power without warrant -

    (1)   to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

    (2)   to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, expulsion, or removal of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States . . . ."

*id.* at 711. The *Euge* Court explained that "this Court has consistently construed congressional intent to require that if the summons authority claimed is necessary for the effective performance of congressionally imposed responsibilities[…], that authority should be upheld absent express statutory prohibition or substantial countervailing policies." *Id*; *see also Lovgren v. Byrne*, 787 F.2d 857, 864 (3d Cir. 1986) (interpreting the Fishery Conservation and Management Act of 1976, 16 U.S.C. § 1801 *et seq.*, which authorizes warrantless inspections of vessels, to implicitly authorize warrantless dock inspections, because otherwise "the agency's efforts to gather accurate information would be substantially frustrated"); c*f. Dalia v. United States*, 441 U.S. 238, 249-254 (1979) (interpreting 18 U.S.C. § 2518 to permit covert entry in order to install bugging devices because "(t)o read the statute otherwise would be to deny the 'respect for the policy of Congress [that] must save us from imputing to it a self-defeating, if not disingenuous purpose'" (441 U.S. at 254, *quoting Nardone v. United States*, 308 U.S. 338, 341 (1939)).

The right to enter private property as requested and obtained here through the administrative warrant, consistent with constitutional limitations, is no less necessary to enable DHS to carry out its remedial responsibilities under the Immigration and Nationality Act than the powers implied in the above cases were to the implementation of the statutory responsibilities of the agencies there involved.

The use of civil orders to authorize the entry upon premises where illegal aliens are believed to be present and to permit their questioning and arrest, where appropriate, was expressly sanctioned by the D.C. Circuit in *Blackie's*, 659 F.2d at 1219-27. In upholding a civil warrant as "reasonable" within the meaning of the Fourth Amendment, the court held that the warrant need not specifically name the suspected illegal aliens if it and accompanying affidavits narrowed down the field of potentially vulnerable persons to those whom Immigration agents might reasonably believe to be aliens. *Id*. at 1226. As such, *Blackie's* upheld the use of a civil order to gain entrance to premises to search for, question, and arrest unnamed aliens who were believed to be present on the premises.

*Id.*

The Ninth Circuit reached a similar conclusion in *Int'l Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547 (9th Cir. 1986):

> We have held that an application for a search warrant "must have sufficient specificity to enable the judge to make an *independent determination* of whether probable cause exists and to prevent the agents from having uncontrolled discretion to rummage everywhere in search of seizable items once lawfully within the premises."

*Id.* at 552-53 (quoting *United States v. Condo*, 782 F.2d 1502, 1505 (9th Cir. 1986) (emphasis original)).  Further, the court in *Molders*' stated:

> The requirement to "identify the suspect(s) by name" or to provide "enough specific identifying information to assure that the search for that person is reasonably likely to result in finding that person" imposes an unreasonable and impractical burden on the INS. We agree (with the *Blackie's* court) that "warrants and accompanying affidavits [that] narrow down the field of potentially vulnerable persons to those employees whom INS agents might reasonably believe to be aliens" . . . satisfy the requirements of the Fourth Amendment even where the targeted persons are not identified by name.

*Id.* at 553 (quoting *Blackie's*, 659 F.2d at 1226).

As the Government acknowledged in its legal memorandum submitted in support of the administrative warrant application, a magistrate judge in the Southern District of Texas has denied an application for a *Blackie's* warrant and called into question the authority for such warrants. *See In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970 (S.D. Tex. 2025).[7] However, this decision is not binding or precedential. The judge in that case stated, "Perhaps the Government thinks that, with an administrative warrant, it can get around the particularity requirements of a Rule 41 warrant. It cannot." *Id.* at 975. This Court need not decide in the abstract whether an administrative warrant may issue where particularized probable cause is lacking for a Rule 41 warrant because the administrative

---

[7] The same magistrate judge reiterated his decision after government counsel in the Southern District of Texas re-filed a nearly identical administrative warrant application with the district court, which reassigned it to the original magistrate. *See In re Sealed Search Warrant Application*, 787 F. Supp. 3d 813, 814-17 (S.D. Tex. 2025).

warrant application was submitted alongside a Rule 41 warrant, the validity of which has not even been challenged by the defendant in this case.[8]

In any event, Congress has provided federal district courts with direct jurisdiction for penalizing certain immigration violations under 8 U.S.C. § 1324a(f), by enacting a criminal provision for a pattern or practice of knowingly hiring or continuing to employ aliens not authorized to work in the United States, *see* 8 U.S.C. § 1324a(f)(1); and a civil provision authorizing injunctive relief against individuals or entities who engage in a pattern or practice of knowingly hiring or continuing to employ aliens not authorized to work in the United States, *see* 8 U.S.C. § 1324a(f)(2).

On a showing of probable cause,[9] the United States may obtain a civil administrative warrant by showing specific evidence of an existing violation or that the inspection will be conducted according to reasonable legislative or administrative standards. *See Blackie's*, 659 F.2d at 1222-25. As explained by the Supreme Court in the context of an administrative warrant to permit an inspection for OSHA violations in the absence of consent to search:

> Whether the Secretary proceeds to secure a warrant or other process, with or without prior notice, his entitlement to inspect will not depend on his demonstrating probable cause to believe that conditions in violation of OSHA exist on the premises. Probable cause in the criminal law sense is not required. For purposes of an administrative search such as this, probable cause justifying the issuance of a warrant may be based not only on specific evidence of an existing violation but also on a showing that reasonable legislative or administrative standards for conducting an . . . inspection are satisfied with respect to a particular [establishment].

*Marhsall v. Barlow's, Inc.*, 436 U.S. 307, 320 (1978) (citation omitted). In *Blackie's*, the INS similarly

---

[8] As detailed further *infra*, the Rule 41 warrant by itself justified the encounter with – and detention of – the defendant.

[9] Even if the definition of probable cause is more flexible in the administrative context, *see* Ex. 3 at 5, here government had and articulated substantial and specific evidence that illegal immigrants were working and would be encountered at the Nutrition Bar facility, as the probable cause section of the affidavit in support of the administrative warrant contained much of the details set forth in the affidavit contemporaneously filed in support of the Rule 41 warrant. *Compare* Ex. 4 *with* Ex. 1.

satisfied the non-criminal probable cause standard by submitting specific evidence that violations of the Immigration and Nationality Act were occurring on the premises to be searched. *See* 659 F.2d at 1226-27.

The affidavit in support of the administrative warrant in this case presented specific evidence that violations of the immigration laws had occurred and were occurring at the Nutrition Bar facility and that illegal immigrants were working and would be encountered there. Ex. 4. The Government thus satisfied the standard set forth in *Blackie's*, as it establishes probable cause "that numerous persons working in nonpublic areas of the [business are] possibly illegal aliens, and [gives] credible reasons for the [affiant's] suspicions as well." *Blackie's*, 659 F.2d at 1226.

By means of an administrative warrant, agents on a search site may engage in systematic consensual questioning of employees. *INS v. Delgado*, 466 U.S. 210, 216-19 (1984). It is well settled that agents may detain a person absent valid seizure or arrest warrants or valid exigent circumstances only if they possess reasonable, articulable, and individualized suspicion of violations of immigration or criminal law. *See Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Violations of immigration law include: (1) an alien's failure to carry on his or her person immigration documents required by law to be carried, 8 U.S.C. § 1304(e); and (2) reentry of a previously removed alien without proper approval, 8 U.S.C. 1326. If an alien claims to possess immigration documentation offsite and not in their possession, they may be detained in the context of a *Terry* stop "only so long as is necessary to carry out [the *Terry* stop's] purpose," and under such circumstances "the investigative methods used should be the least intrusive means reasonably available to confirm or dispel the officer's suspicion." *See Martinez v. Nygaard*, 831 F.2d 822, 827 (9th Cir. 1987); *see also United States v. Machuca-Barrera*, 261 F.3d 425 (5th Cir. 2001) (addressing immigration checkpoint stops).

Accordingly, this Court should rule that administrative warrants of the type sought and obtained in this case do not run afoul of the Constitution and that the specific administrative warrant at issue was legally and factually sound.

**B.  The Defendant Was Appropriately Detained.**

The defendant complains repeatedly about the "mass seizure" of Nutrition Bar employees, *see* Motion at 2, 14, 21, 23, 28, but she does not have – or claim to have – standing to challenge the detention of other individuals who have been charged with a crime separately (or not at all). *See Rakas v. Illinois*, 439 U.S. 128, 133–35 (1978). She acknowledges that law enforcement officers executing a search warrant may temporarily detain people in the "immediate vicinity" of the search area, though she argues that "the occupants seized must 'pose[] a real threat to the safety and efficient execution of a search warrant." Motion at 21 (quoting *Bailey*, 568 U.S. at 201). In arguing this point, the defendant misconstrues the *Bailey* decision. In *Bailey*, the Supreme Court rejected the notion that the detention of people during a search warrant could be sanctioned beyond "the immediate vicinity of the premises to be searched," 568 U.S. at 201, as the defendant in that case had been stopped in his car approximately one mile from the search location, *id.* at 190-91. The thrust of the *Bailey* decision is that individuals "on the premises" – and thereby necessarily in "the immediate vicinity" – of the search can "become disruptive, dangerous, or otherwise frustrate the search" if not detained. *Id.* at 195.[10]

In *Muehler v. Mena*, 544 U.S. 93 (2005), the defendant claimed that officers searching the home she occupied violated her constitutional rights by detaining her in handcuffs during the search and questioning her about her immigration status. The Supreme Court found that the defendant's detention during the search was "plainly permissible" and "the officers' questioning of [her] did not constitute an independent Fourth Amendment violation." *Id.* at 98, 102.[11]

---

[10] The defendant claims that the Rule 41 warrant could not have justified any seizures because U.S. citizens were allowed to leave. Motion at 23. This argument is illogical. Investigators can choose not to seize people (or things) they would otherwise be authorized to seize. Here, officers initially and briefly seized *all* employees, asked questions to ascertain which of those employees might be present unlawfully, and allowed the rest to leave. Nothing about that process calls into question their authority to briefly seize *everyone* in the first place as part of securing the facility for search and then to focus their questioning on non-citizens suspected of immigration violations.

[11] Notably, the Supreme Court separately analyzed the use of handcuffs during the defendant's detention in *Mena*, concluding that handcuffs were appropriate because the warrant involved "a search

During the Nutrition Bar search, 60 agents were attempting to secure and search a massive production facility containing approximately 160 employees, so it was reasonable for the sake of officer safety, evidence preservation, and efficiency to detain the employees together in groups and not to allow them to continuously and individually mill around the facility. *See* McCoy Decl. ¶¶ 5-6, 8, 14; *Mena*, 544 U.S. at 98, 102; *Bailey*, 568 U.S at 195. In fact, allowing 160 employees to move freely about a food production facility while it is being searched would be inherently unwise, particularly where the workforce outnumbered law enforcement three to one and where so many employees were reasonably believed to be in the country illegally, creating an incentive for such employees to flee or resist. *See* McCoy Decl. ¶ 17 ("This [food production] area had very loud machinery with moving parts, some of which appeared dangerous and involved hot liquid. It would not have been safe or feasible for such workers to continue operating the machinery and moving around as needed to run these production lines during the search.").

The defendant maintains, however, that no such temporary detentions were appropriate during the Nutrition Bar search because "it is unreasonable to think" that evidence could be found "on the production line (where Argentina was working), where NBC stored granola bars, in the cafeteria, in the parking lot, in the grass field that is part of the property or in the bathrooms." Motion at 22. Not so. Agents were not limited to the most likely places on premises in its search for relevant items to seize, and defendant and her co-workers were unquestionably in the "immediate vicinity" of the production facility and its grounds, which the Rule 41 specifically authorized the team to search. *See* Ex. 2. After all, if law enforcement could only search file cabinets in front offices for incriminating documents, individuals and companies would readily be able to escape detection by maintaining such records in

_____

for weapons and a wanted gang member." 544 U.S. at 99-100. Here, the defendant alleges that she was handcuffed only for transport after she was escorted outside, *see* Defendant Decl. ¶ 20, so the issue of whether the agents in this case could have handcuffed all of the employees inside Nutrition Bar during the search is a hypothetical one not presented by the pending Motion.

remote parts of their premises. Regardless, the Rule 41 warrant inherently authorized investigators to secure the location to be searched, including by entering the production line, the cafeteria, the parking lot, bathrooms, and all other areas of the facility.[12]

The defendant makes lengthy and repeated references to these other areas, *see* Motion at 1, 5-6, 13, 19, 22, but she was not encountered in any of those locations. Indeed, she was not even on the production line. The defendant had abandoned her post on the production line upon learning that a police search was underway, and when she did encounter a member of the entry team who told her to stop, she disobeyed that instruction, despite understanding it and knowing that the person who gave the order was a "police" officer. Defendant Decl. ¶¶ 6-7. In various contexts, failure to obey law enforcement officers can create "reasonable suspicion." *See Kistner v. City of Buffalo*, No. 21-CV-526, 2023 WL 144915 at *7 (W.D.N.Y. Jan. 10, 2023) (observing that if the plaintiff "did disobey the officers' orders, the officers may have had reasonable suspicion – or at least arguable reasonable suspicion – to believe that [he] was obstructing governmental administration); *United States v. Patton*, 705 F.3d 734, 741 (7th Cir. 2013) (defendant's "instinct to disobey the officers and to step purposely away . . . coupled with his overtly nervous demeanor . . . gave rise to a reasonable suspicion that he might have a weapon"). Flight, such as the defendant's turning from and walking away from the officer who directed her to stop, is a further basis for reasonable suspicion. *See Babula v. INS*, 665 F.2d 293, 297 (3d Cir. 1981); *Lee v. INS*, 590 F.2d 497, 498 (3d Cir. 1979). Under some circumstances, an individual has the right "to ignore the police and go about his business." *Illinois v. Wardlow*, 528 U.S. 120, 125 (2000).[13] Moreover, "refusal to cooperate, without more, does not furnish the minimal level

---

[12] Contrary to the defendant's claim, *see* Motion at 23, the Government does not read the warrant application materials as a concession that the Rule 41 warrant did not suffice here. Indeed, the Government sought the administrative warrant "out of an abundance of caution." *See* Ex. 3 at 1-2 n.2.

[13] For purposes of this Motion, it is unnecessary to determine the scope of this go-about-your-business doctrine as it relates to the execution of a search warrant (as opposed to an encounter on the street).

of objective justification needed for a detention or seizure." *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429 (1991)). However, in *Wardlow*, the Supreme Court also recognized that "unprovoked flight is simply not a mere refusal to cooperate. Flight, by its very nature, is not "going about one's business"; in fact, it is just the opposite." *Id.* Here, the defendant stopped going about her business *because the police had arrived*, left her workstation, and then disobeyed a direct command to "stop" and deliberately walked away from the officer who gave it. Defendant Decl. ¶¶ 6-7. Under the circumstances, where investigators had probable cause to believe that evidence of immigration crimes would be found at the facility based on information developed during the months-long investigation, *see* Exs. 1 & 5, the defendant's actions gave rise to individualized reasonable suspicion that she was an alien. That, in turn, warranted her detention and further questioning, separate and apart from the administrative warrant or even from the need for her to be detained alongside everyone else as an officer safety precaution under the Rule 41 warrant. *See Brignoni-Ponce*, 422 U.S. at 885 n.10 ("Each case must turn on the totality of the particular circumstances.")

The Government is not claiming that the officers who instructed the defendant to stay in the break room and to wait her turn for questioning had personal knowledge of the defendant's nervous, evasive, and disobedient actions. After all, there were approximately 60 officers and over 150 employees present at the outset of the search. McCoy Decl. ¶¶ 6, 8. But the Second Circuit has recognized that "[u]nder the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). Here, then, shortly after the initial entry by the agents and even before the defendant got to the break room, officers had specific, articulable facts as described above, sufficient to give rise to a reasonable suspicion that the defendant was an alien. *Cf. United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014) (explaining *Terry* stop standard).

When asked in the large group setting, the defendant did not claim to be a U.S. citizen or to have work authorization, meaning, practically, that she – along with others in her situation – de facto self-identified as present illegally in some manner (or at least self-identifying as someone for whom investigators had reasonable suspicion to believe was present illegally). *Cf. Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty*, 542 U.S. 177, 180, 190-91 (2004) (concluding no Fifth Amendment violation occurred where a defendant "was arrested and convicted for refusing to identify himself during a [*Terry*] stop").[14] As officers in this case had the legal right to question the employees about their immigration status while the employees were detained (without handcuffs) for safety and site security reasons during the search, there is no reason they could not do some of this questioning by dividing them into groups through the means of generally applicable, non-coercive questions. *Cf. Mena*, 544 U.S. at 98, 102.

In *Delgado*, the Supreme Court sanctioned the systematic interviews of employees during "factory surveys," despite the posting of agents at the doors, in part because the encounters were consensual, and the defendants were free to leave. 466 U.S. at 211-21. In this case, the Nutrition Bar employees, including the defendant, were not free to walk anywhere they wanted or to leave the facility at will while the agents secured and maintained the security of the building for the Rule 41 search. However, the employees were free to leave their individual interviews with agents or simply refuse to answer questions. Indeed, the defendant's interview shows this – she did not want to engage with the officer who interviewed her, and after a very brief time she left the conversation on her terms and moved on her own to another part of the room, all without handcuffs or other restraints. *See* Tuck Aff. Ex. 11 at 9:52:45 – 9:52:59.

The defendant further claims to have been "pushed into a corner," but that is contradicted by

---

[14] The Government recognizes that at trial it may not be permitted to use the defendant's pre-arrest silence as substantive evidence of her guilt, *see United States v. Okatan*, 728 F.3d 111, 120 (2d Cir. 2013), which is not a live issue at this stage.

body camera footage showing her and others standing in a relatively orderly group and line. *See* Tuck Aff. Ex. 10 at 9:41:14 – 9:44:29; *Id.* Ex. 11 at 9:48:06 – 9:52:59. When it was her turn to be questioned, the defendant refused to answer where she was from or to produce any documents. Defendant Decl. ¶ 14. As a non-citizen, the defendant was legally required to "at all times carry with [her] and have in [her] personal possession any certificate of alien registration or alien registration receipt card issued to [her] . . . ." 8 U.S.C. 1304(e). Here, the defendant's refusal to produce her immigration documents upon request, where the defendant had already disobeyed a direct command of an officer to "stop" and had walked away from that officer and where she did not avail herself of opportunities to identify herself as a citizen or legally authorized worker, gave the agents probable cause to arrest her without a warrant. *See* 8 U.S.C. § 1357; *Martinez v. Nygaard*, 831 F.2d 828 ("An individual's admission that she is an alien, coupled with her failure to produce her green card, provides probable cause for an arrest."); *see also* Ex. 3 at 6-7 (explaining that "an alien's failure to carry on his or her person immigration documents required by law to be carried" would be among the possible "[v]iolations of immigration law" to be encountered during the Nutrition Bar warrant). The defendant's failure to produce her immigration documents during the Nutrition Bar search, in light of all relevant circumstances, gave the agents probable cause to detain her and take her to a Border Patrol facility for further identification and processing. Such transport was necessary in part because the on-site team's ability to use remote technology to identify illegally present individuals was imperfect. Burrell Decl. ¶ 6.[15]

### C. The Defendant's Identity Should Not Be Suppressed.

Even if this Court determines that the defendant's detention and transport to the Oswego Border Patrol station was unlawful, it should not invoke the exclusionary rule or suppress her identity, including her booking photograph(s) and fingerprints. First, any reliance on the now-challenged

---

[15] The defendant denies that the on-site officers learned any specific biographical information about her before she left the Nutrition Bar facility. Defendant Decl. ¶ 17.

administrative warrant was in good faith, as the Government made plain that it intended to search the entire facility; speak to every employee; and identify and detain illegal immigrants. *See* Exs. 1, 3, 4. This is not a situation where the magistrate judge was misled or "wholly abandoned [her] judicial role"; where the warrant application "is so lacking in indicia of probable cause as to render reliance upon it unreasonable"; or where "the warrant is so facially deficient that reliance upon it is unreasonable." *Raymonda*, 780 F.3d at 118.

In *Lopez-Mendoza*, the Supreme Court addressed "whether an admission of unlawful presence in this country made subsequent to an allegedly unlawful arrest must be excluded as evidence in a civil deportation hearing." 468 U.S. at 1034. One of the respondents had been arrested at a transmission repair shop when "one agent engaged the proprietor in conversation" while another agent, without a warrant, entered the shop and questioned the suspected alien, all after the owner had "firmly refused to allow the agents to interview his employees during working hours." *Id.* at 1035. The second respondent was arrested at a potato processing plant after immigration officers entered the plant, causing many employees to head for the exits, where other officers were waiting to look "for passing employees who averted their heads, avoided eye contact, or tried to hide themselves in a group" and for those who "could not respond in English" to "innocuous questions." *Id.* at 1036-37. Even though the *Lopez-Mendoza* case did not involve criminal charges, the Supreme Court broadly stated that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is *never* itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." 468 U.S. at 1039 (emphasis added). Later in the opinion, the Court held:

> [W]e do not deal here with egregious violations of Fourth Amendment or other liberties that might transgress notions of fundamental fairness *and undermine the probative value of the evidence obtained. At issue here is the exclusion of credible evidence gathered in connection with *peaceful arrests* by INS officers. We hold that evidence derived from such arrests need not be suppressed in an INS civil deportation hearing.

*Id.* at 1050-51 (emphasis added).

In applying *Lopez-Mendoza*, the Second Circuit has held that "exclusion of evidence is

appropriate under the rule of *Lopez-Mendoza* if record evidence established either (a) that an egregious violation that was fundamentally unfair had occurred, or (b) that the violation-regardless of its egregiousness or unfairness-undermined the reliability of the evidence in dispute." *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 235 (2d Cir. 2006). The operative facts in *Almeida-Amaral* were as follows:

> Late on the night of January 26, 2003, Almeida-Amaral was approached by a uniformed border patrol agent just as he entered, by foot, the parking lot of a gas station adjacent to a restaurant along a highway in southern Texas. The agent instructed petitioner to stop and requested identification from him. In response, petitioner showed the officer his Brazilian passport, at which point he was arrested and taken into custody.

461 F.3d at 232. The Second Circuit went on to hold the following:

> *Lopez-Mendoza* requires more than a violation to justify exclusion. It demands 'egregiousness.' And, applying our first principle, we believe that while the lack of any valid basis whatsoever for a seizure sets the stage for egregiousness, more is needed. Thus, exclusion may well be proper where the seizure itself is gross or unreasonable in addition to being without a plausible legal ground, *e.g.,* when the initial illegal stop is particularly lengthy, there is a show or use of force, etc.
>
> We have found nothing in the record of the instant case to support any such finding. In fact, had the agent not yelled stop to Almeida-Amaral, the officer's act of asking petitioner for identification would probably not have been a seizure at all. Under these circumstances, we conclude that the suspicionless seizure, albeit invalid, was not sufficiently severe to be deemed egregious under *Lopez-Mendoza.*
>
> Even so, our second principle means that, were there evidence that the stop was based on race, the violation would be egregious, and the exclusionary rule would apply. . . . Almeida-Amaral offers nothing other than his own intuition to show that race played a part in the arresting agent's decision. Almeida-Amaral asserts, in an affidavit, that the agent stopped him because of his race. But he alleges no facts adequate to support that belief. . . . Because of the absence of evidence that the stop was race-based, we conclude that Almeida-Amaral has not established that the Fourth Amendment violation was an egregious one.

*Almeida-Amaral v. Gonzales*, 461 F.3d 231, 235–37 (2d Cir. 2006) (some citations omitted).

In the criminal context, the Second Circuit has held that "*Lopez-Mendoza* reaffirmed a long-standing rule of personal jurisdiction; it did not create an evidentiary rule insulating specific pieces of identity-related evidence from suppression." *Pretzantzin v. Holder*, 725 F.3d 161, 166 (2d Cir. 2013).

Still, the Second Circuit has held previously that "the identity of defendants is not suppressible under the exclusionary rule." *Adegbite*, 846 F.2d at 838-39 (reversing suppression of defendant who was questioned about his identity after taken into custody and before being read his *Miranda* rights).

Even if this Court determines that the holdings in *Lopez-Mendoza* and *Adegbite* do not apply, suppressing the defendant's identity, pre-existing immigration file, and/or fingerprints[16] would be problematic because the defendant does not have lawful authority to be in this country such that she would be subject to re-arrest if released, which the Supreme Court acknowledged in *Lopez-Mendoza*:

> Sandoval–Sanchez is a person whose unregistered presence in this country, without more, constitutes a crime. His release within our borders would immediately subject him to criminal penalties. His release would clearly frustrate the express public policy against an alien's unregistered presence in this country. Even the objective of deterring Fourth Amendment violations should not require such a result. The constable's blunder may allow the criminal to go free, but we have never suggested that it allows the criminal to continue in the commission of an ongoing crime.

468 U.S. at 1047. *See also United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005) ("Because Navarro–Diaz could simply be reindicted for the same offense [if released], suppressing his identity would have little deterrent effect upon the police who questioned him during his allegedly unlawful detention.").

In the *United States v. Morales-Lopez* case cited by the defendant, this Court declined to suppress biographical evidence obtained from the defendant after an arrest of an alien that this Court concluded was a "deliberate, reckless, or grossly negligent" constitutional violation. Case No. 5:25-CR-94 (BKS), Dkt. 47 (N.D.N.Y. May 19, 2025). This Court stated:

> [E]ven though the facts in this case are not as benign as the ones in *Navarro-Diaz*, the Government has conceded that it will not use, in its case-in-chief, body cam footage of the seizure or the Defendant's statements and the Court finds that with respect to any remaining fruits of the seizure the lack of

---

[16] Suppressing the defendant's fingerprints taken after her arrest would only create unnecessary delay, as they could be reobtained by subpoena, *cf. In re Doe*, 317 F. App'x 54, 56 (2d Cir. Mar. 20, 2009) (summary order); *In re Liberatore*, 574 F.2d 78, 82-83 (2d Cir. 1978), or by obtaining a search warrant.

deterrent value renders the exclusionary rule inapplicable.

*Id.* at 12.

Here, the body camera footage is not relevant to the charge against the defendant, and the Government likewise represents that it will not show to the jury in its case-in-chief at trial the video of the defendant's interview. Further, this is not a case where the defendant was interviewed and made admissions about her prior removals.[17] In fact, this case is even more benign than *Navarro-Diaz*, which involved a warrantless seizure at a hotel. Here, the agents had established in the Rule 41 warrant application probable cause of various criminal and immigration-related violations, *see* Ex. 1, and for purposes of the administrative warrant they established probable cause that the Nutrition Bar facility would have present "concealed illegal aliens in violation of the laws regulating the admission, exclusion, expulsion, or removal of aliens." *See* Ex. 5. The body camera footage provided to this Court by the defendant shows that the Nutrition Bar employees were, for the most part, separated into groups, lined up, and spoken with on an individual basis. *See* Tuck Aff. Exs. 10-13. Those who were detained were not assaulted or mistreated.[18] *See, e.g.*, Burrell Decl. ¶ 5; Mulzoff Decl. ¶¶ 3-4. Indeed, there are no allegations that Nutrition Bar employees were threatened, harmed, or that weapons were pointed at them. Under the circumstances, the deterrent value of the exclusionary rule would be minimal, if not

---

[17] Notably, the defendant complains that one of the reports produced in this case indicated that she "freely admitted" to being in the United States illegally and to not possessing valid immigration documentation. Motion at 25. The contents of that report have nothing to do with this suppression motion, so if that report has errors, they are immaterial to this Court's decision. Moreover, the defendant did admit by omission or inaction on scene that she was not a United States citizen and refused to engage regarding requested immigration documents, as described above.

[18] As mentioned above, the defendant claims that she was shackled with a chain and handcuffed to it, but there is no evidence that anyone on scene was transported that way. *Compare* Defendant Decl. ¶ 20 *with* Mulzoff Decl. ¶¶ 3-4 & Fig. 1. This is not the only self-serving hyperbole in her declaration inconsistent with the evidence, as described above. *Compare* Defendant Decl. ¶ 13 (claims of being pushed into a corner with the others in her group) *with* Tuck Aff. Ex. 10 at 9:41:14 – 9:44:29 (showing the defendant and others in a relatively ordered line); *see also* Tuck Aff. Ex. 11 at 9:48:06 to 9:52:59 (no evidence of pushing into the corner as the defendant advances to the front of the line).

nonexistent, in this case.[19] This search did not involve a widescale, willful deprivation of rights.

## IV.    CONCLUSION

The only disputed facts appear to be about non-material matters, such as whether the defendant was placed in soft restraints like everyone else or wrapped up with metal chains, or whether her orderly line in the break room was tantamount to being "pushed" into a corner. The Government does not believe an evidentiary hearing is necessary to rule on the legal issues presented by the salient core of undisputed facts in this case, and the Government respectfully urges this Court to deny the pending suppression motion in its entirety.

---

[19] The defendant complains that the complaint affidavit is false insofar as it claimed that immigration authorities identified her by name, nationality, and immigration status "on scene," Motion at 6-7. The language in the complaint affidavit was written by a prosecutions agent who did not claim personal knowledge of the described events, *see* Dkt. 1; Ex. 9 ("Rodriguez Decl.") ¶¶ 2-3, and it is irrelevant to the issues before this Court. The complaint has since been superseded by an indictment, meaning a grand jury has found probable cause of the operative criminal charge. *See* Dkt. 13. Moreover, the defendant does not – and cannot – claim that probable cause for the complaint would have been lacking if the two challenged words, "on scene," had not been included in the affidavit. Indeed, it is beyond question that agents did, prior to the complaint's submission, identify the defendant, her country of origin, and her immigration history. The government does not concede that the complaint affidavit, which represents the information understood by the affiant at the time it was written, is or was false, let alone willfully so. *See* Dkt. 1 ("This affidavit is based upon information I reviewed and/or received from law enforcement colleagues and immigration database checks.); Rodriguez Decl. ¶ 4 (explanation from a prosecutions supervisor at the Oswego Border Patrol station that he also understood on the day of the warrants that "alienage and/or identities" of Nutrition Bar employees transported to the station had been identified on scene); McCoy Decl. ¶ 7 (explaining that the body camera footage was not compiled or made available to Border Patrol until well after the complaint was filed).