AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Northern District of New York

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br>**12351 State Route 34, Cato, New York 13033,**<br>**as further described in Attachment A** | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Case No. **5:25-SW- 211**   **(TWD)**

USAO No. **2025R00368**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*: **12351 State Route 34, Cato, New York 13033, as further described in Attachment A**

located in the Northern District of New York, there is now concealed *(identify the person or describe the property to be seized)*: **See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is (check one or more):
☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☒ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| **Title 8, United States Code, Section 1324** | **Hiring Illegal Aliens, Smuggling Illegal Aliens, Transporting Illegal Aliens or Harboring Illegal Aliens** |
| **Title 18, United States Code, Section 1028** | **Fraud and Related Activity in Connection with Identification Documents, Authentication Features and Information** |
| **Title 42, United States Code, Section 408(a)(7)(B)** | **Use of a False Social Security Number** |

The application is based on these facts:
**See Attached Affidavit**

☒ Continued on the attached sheet.
☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

**Andrew McCoy, Special Agent, HSI**
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by Video Conference.

Date: **Aug 28, 2025**

_____
*Judge's signature*

City and state: **Syracuse, New York**

Hon. Therese Wiley Dancks, U.S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF:<br><br>**12351 State Route 34, Cato, New York 13033** | Case No. 5:25-SW- 211  (TWD)<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Andrew McCoy, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I am a Special Agent with Homeland Security Investigation (HSI) within the Department of Homeland Security, assigned to the office of the Resident Agent in Charge, Syracuse, New York, and have been so employed since December 2008.  In my capacity as a federal agent, I have investigated criminal violations relating to illegal re-entry, forced labor, harboring of unauthorized aliens and hiring or recruitment of unauthorized aliens.

2.  This affidavit is submitted in support of an application for a warrant to search the following premises:

a.  Nutrition Bar Confectioners, 12351 State Route 34, Cato, New York 13033 ("SUBJECT PREMISE")

3.  As set forth in more detail below, there is probable cause to believe that evidence, contraband, fruits, and instrumentalities of violations of Title 8, United States Code, Section 1342(a) (Employing Unauthorized Aliens), Title 18, United States Code, Section 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features and Information); and Title 42, United States Code, Section 408(a)(7)(B) (Use of a False Social Security Number), (hereinafter, collectively the "TARGET OFFENSES") are located within the

1

SUBJECT PREMISE.

4.  The statements contained in this affidavit are based upon my investigation, information provided to be by other law enforcement personnel, and on my experience and training as a special agent of HSI.  Because this affidavit is being submitted for the limited purpose of establishing probable cause to secure a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth facts that I believe are necessary to establish probable cause to believe that evidence, contraband, fruits and instrumentalities to the TARGET OFFENSES are presently located at the SUBJECT PREMISE.

**INVESTIGATION OVERVIEW**

5.  NUTRITION BAR CONFECTIONERS is a family-owned and operated nutrition bar manufacturer.  Public records indicate that the business is located at 12351 State Route 34, Cato, New York 13033, the SUBJECT PREMISE.

6.  As set forth in greater detail below, law enforcement has obtained statements from individuals who work and/or worked for NUTRTITION BAR CONFECTIONERS and said that they were not asked for and did not provide any employment documentation.  Some of these individuals were also in possession of payroll checks and W-2s that contained fraudulent social security numbers.

7.  Records obtained from the New York State Department of Labor for NUTRITION BAR CONFECTIONERS identified employees with fake and fraudulent social security numbers.

2

**PROBABLE CAUSE**



10. On or about February 24, 2025, law enforcement conducted surveillance in and around the area of the SUBJECT PREMISE. At approximately 10:50 PM, the Oswego County Sheriff's Department encountered a Honduran national on State Route 104 in the town of Hannibal, New

York.  The individual was driving a 2004 Honda Pilot, license plate ▮▮▮▮ registered to Ramon Rosa CACERAS-CACERAS at ▮▮▮▮ Fulton, New York 13069.  CACERAS-CACERAS had driven across a hazard marking and was issued a NYS Uniform Traffic Ticket. During the stop, CACERAS-CACERAS provided the OCSO Deputy with a New York State Learner's Permit. Shortly after the stop, the Oswego County Sheriff's Deputy contacted the Oswego Border Patrol Station for assistance with CACERAS-CACERAS and it was determined that he was illegally present in the United States.  CACERAS-CACERAS admitted to being a national of Honduras and stated he did not possess any immigration documents allowing him to enter or remain in the United States.

11. USBP agents determined, through immigration checks, that CACERES-CACERES illegally crossed into the United States on June 16, 2018, at/near Hidalgo, Texas. CACERES-CACERES was apprehended by Weslaco Station Border Patrol Agents on June 16, 2018, and was processed as an Expedited Removal and ordered removed by Immigration Judge on June 17, 2018. CACERES-CACERES was removed through Valley International Airport in McAllen, Texas on July 9, 2018.  Law enforcement also learned that CACERES-CACERES illegally crossed into the United States again on May 25, 2019, at an unknown time and location.  CACERES-CACERES was apprehended by Border Patrol Agents from the Falfurrias Border Patrol Station on June 5, 2019, and received a Final Order of Removal on June 5, 2019.  CACERES-CACERES was removed through Valley International Airport in McAllen, Texas on June 20, 2019.

12. USBP agents interviewed CACERAS-CACERAS and determined that he was a citizen of Honduras and had entered the United States illegally for a third time on or about August 24, 2019. CACERAS-CACERAS confirmed that he did not possess any immigration documents allowing him to enter, remain or work in the United States.  As such, CACERAS-CACERAS was illegally present in the United States.

4

13. During an inventory search of CACERAS-CACERAS's vehicle, numerous employment documents were found including paystubs and a W-2 from Nutrition Bar Confectioners and another Oswego County based business, C.F.O. LLC. These documents listed different social security numbers for CACERAS-CACERAS. Specifically, the W-2 from NUTRITION BAR CONFECTIONERS, located at the SUBJECT PREMISE, identified CACERAS-CACERAS's social security number ████████████ ending in 2892, while the paystubs from C.F.O. LLC identified CACERAS-CACERAS's social security number as ending in 5179. The W-2 from NUTRITION BAR CONFECTIONERS was for tax year 2024 and was found with no postal markings. The W-2 reported ██████ paid to CACERAS-CACERAS in wages, with $0.00 Federal Income Tax Withheld; ██████ in Social Security Tax Withheld; and ██████ n Medicare Tax Withheld. The paystubs from NUTRITION BAR CONFECTIONERS identified CACERAS-CACERAS as Employee ID 827, with an hourly rate of $16.50. CACERAS-CACERAS's federal filing status was listed as "S," and the state filing status was listed as "S-5".

14. CACERAS-CACERAS was in possession of a cellular telephone, which he gave law enforcement written consent to search. Your affiant reviewed the forensic examination and found numerous communications with an individual identified as "████ 5025@s.whatsapp.net Zavala." The following is a transcript of some of these communications, which have been translated from Spanish to English for purposes of this affidavit (and which includes apparent typographical errors that appear in the original):

**November 11, 2024**
████ 5025@s.whatsapp.net Zavala:    I need a photo of you your date of birth where is it from which country but if you don't want to put the same name on the paper can put another Name of other surname as you want

**November 12, 2024**
████ 025@s.whatsapp.net Zavala:

5



| | |
|---|---|
| CACERAS-CACERAS: | And those |
| CACERAS-CACERAS: | They are already |
| ████ 6025@s.whatpsappnet Zavala: | If those are |
| CACERAS-CACERAS: | Now is where they are |
| ████ 6025@s.whatpsappnet Zavala: | They already sent them to the girl |
| 6025@s.whatpsappnet Zavala: | Tomorrow yegan Arbun |
| 6025@s.whatpsappnet Zavala: | Hey says they are still before 12 o'clock |
| 6025@s.whatpsappnet Zavala: | Well, he's talking about picking them up |
| CACERAS-CACERAS: | Ask him the time to go for them to Karina who will give them an esepsion to us for favor |

**November 13, 2024**

| | |
|---|---|
| CACERAS-CACERAS: | If they're before I'll go for them |
| ████ 6025@s.whatpsappnet Zavala: | Tomorrow he will have them |
| CACERAS-CACERAS: | I'm here |
| CACERAS-CACERAS: | Could it be that I wait |
| CACERAS-CACERAS: | Or I ask |
| ████ 6025@s.whatpsappnet Zavala: | I'm already entering |
| 6025@s.whatpsappnet Zavala: | Ay |
| CACERAS-CACERAS: | I don't see |
| ████ 6025@s.whatpsappnet Zavala: | Foundation |
| 6025@s.whatpsappnet Zavala: | And they will enter |
| 6025@s.whatpsappnet Zavala: | Is it a U.S. |
| 6025@s.whatpsappnet Zavala: | He asks them about Extor |
| 6025@s.whatpsappnet Zavala: | Like 2, 15 or 10 wings come in |
| CACERAS-CACERAS: | Come |

█████ 6025@s.whatpsappnet Zavala:      I'm already in
      6025@s.whatpsappnet Zavala:      Look, there are already the papers where Karina
CACERAS-CACERAS:                       Ok
CACERAS-CACERAS:                       What direction did he give
█████ 6025@s.whatpsappnet Zavala:      █████ arbun Ny 13021

15. The Social Security Administration ran a search for the social security number ending in 2892 (appearing on CACERAS-CACERAS's W-2 from NUTRITION BAR CONFECTIONERS) and determined that the number was not a valid social security number issued by the Social Security Administration.

16. Your affiant conducted records checks related to the United States Legal Permanent Resident (LPR) card sent from █████ 6025@s.whatsapp.net Zavala to CACERES-CACERES on November 12, 2024, which is described in paragraph 14 and included above. Upon visual inspection and records checks in law enforcement databases, the United States Legal Permanent Resident (LPR) card appears to be fraudulent, as there is no record of this Legal Permanent Resident (LPR) card being issued to anyone in the United States.

17. On or about March 10, 2025, law enforcement conducted surveillance in and around the area of the SUBJECT PREMISE. At approximately 4:20 pm, the Oswego County Sheriff's Department encountered a Guatemalan National on State Route 104 in the town of Hannibal, New York. The individual was driving a 2024 Hyundai, license plate █████ registered to Mauro HERNANDEZ-BATZ at █████ Fulton, New York 13069. HERNANDEZ-BATZ had failed to signal and was issued a NYS Uniform Traffic Ticket. During the stop, HERNANDEZ-BATZ provided the OCSO Deputy with a New York State driver's license. Shortly after the stop, the Oswego County Sheriff's Deputy contacted the Oswego Border Patrol Station for assistance, and it was determined that HERNANDEZ-BATZ was illegally present in the United States. HERNANDEZ-BATZ admitted to being a national of Honduras and stated he did not possess any immigration documents allowing him to enter or remain in the United States.

18. HERNANDEZ-BATZ was transported back to the Oswego Border Patrol Station where he was read his Miranda Rights and agreed to speak with law enforcement. At the start of the interview, HERNANDEZ-BATZ indicated that he was more comfortable speaking in Spanish and wished to have an interpreter present during the interview, so a Border Patrol agent assisted with the interview.

19. HERNANDEZ-BATZ stated that he applied for a job at NUTRITION BAR CONFECTIONERS, located at the SUBJECT PREMISE, while he was living in Maryland. HERNANDEZ-BATZ explained he could not find "good work" in Maryland because employers were not hiring Hispanic workers. HERNANDEZ-BATZ found the NUTRITION BAR CONFECTIONERS website and submitted a photograph of his New York driver's license and his Guatemalan Passport with the online application. HERNANDEZ-BATZ contacted NUTRITION BAR CONFECTIONERS weekly to check on the status of his job application, and he estimated it took approximately one year to be hired by NUTRITION BAR CONFECTIONERS.

20. HERNANDEZ-BATZ stated after being offered the job, he went to the NUTRITION BAR CONFECTIONERS factory located at the SUBJECT PREMISES and met with an American woman with green eyes and dyed hair to complete the new hire paperwork. HERNANDEZ-BATZ stated that he provided this female with his Guatemalan passport, his Guatemalan Counselor ID card and his New York State driver's license during the hiring process. HERNANDEZ-BATZ stated he did not provide any additional identification documents to NUTRITION BAR CONFECTIONERS, such as an I-9[2] (Employment Eligibility Verification) form. When asked by law enforcement, HERNANDEZ-BATZ stated he did not have a Social Security Number and was

---

[2] Employers use Form I-9 to verify the identity and employment authorization of individuals hired for employment in the United States. All U.S. employers must properly complete Form I-9 for every individual they hire for employment in the United States. This includes citizens and aliens. Both employees and employers (or authorized representatives of the employer) must complete the form.

never asked for a Social Security Card by NUTRITION BAR CONFECTIONERS.[3] HERNANDEZ-BATZ claimed he did not fill out any tax documentation while onboarding at NBC—only safety protocols and NBC policy paperwork.

21. HERNANDEZ-BATZ stated he worked five days a week at NBC, approximately six hours a day, and was paid $15.00 an hour. HERNANDEZ-BATZ stated he was always paid with a check and never cash.

22. After a short break during this interview, HERNANDEZ-BATZ advised law enforcement he had filed tax returns and "always tried to pay his taxes." HERNANDEZ-BATZ stated he used a business on Genesee Street in Syracuse, New York, to assist him with filing his income taxes. HERNANDEZ-BATZ explained that he spoke to someone via phone at this income tax business and after the conversation he received an envelope in the U.S. Mail containing documents that were completed, one of the documents included an Electronic Transmitter Identification Number (ETIN) number.[4] The documents were marked in the places that HERNANDEZ-BATZ had to sign, which he did, and he mailed them back to the business location in Syracuse, New York. HERNANDEZ-BATZ included copies of his New York State driver's license, Guatemalan passport and Counselor ID card in his return mailing. HERNANDEZ-BATZ added that the individuals he spoke with knew he was an illegal alien.

23. After signing and returning the above paperwork, HERNANDEZ-BATZ stated he most

---

[3] Although HERNADEZ-BATZ stated in his interview with law enforcement that he did not have a Social Security number and he did not provide Nutrition Bar Confectioners any Social Security card or number at the time he worked at Nutrition Bar Confectioners, records received from the New York State Department of Labor later revealed that Nutrition Bar Confectioners reported wages earned by HERNANDEZ-BATZ in connection with a Social Security number ending in 0318.

[4] Electronic Transmitter Identification Number (ETIN) is a 5-digit identification number assigned by the IRS to a participant in IRS e-file that performs activity of transmission and/or software development.

recently spoke over the phone with a woman in Florida he knew as "Ms. Camacho." Ms. Camacho has filed HERNANDEZ-BATZ's tax returns on his behalf for the past few years.

24. HERNANDEZ-BATZ repeated that he did not provide the ETIN number he received in the mail to NUTRITION BAR CONFECTIONERS at any point during his employment.

25. On or about April 16, 2025, law enforcement encountered Maria Celia ORTIZ-BANUELO, in the city of Fulton, New York. ORTIZ-BANUELO, a Guatemalan national, admitted to being illegally present in the United States. ORTIZ-BANUELO agreed to speak with law enforcement with no promise of anything in return. At the start of the interview, ORTIZ-BANUELO indicated that she did not understand English and wished to have an interpreter present during the interview, so a Border Patrol agent assisted with the interview.

26. ORTIZ-BANUELO explained she has worked at NUTRITION BAR CONFECTIONERS for approximately three years and that she has never had legal status to be present or work in the United States. ORTIZ-BANUELO stated there is a pastor in the Fulton New York area, who assists illegal alien workers with getting employment at NUTRITION BAR CONFECTIONERS, located at the SUBJECT PREMISE. ORTIZ-BANUELO explained to law enforcement that she does not have a valid United States Social Security number and when she applied and interviewed for employment at NUTRITION BAR CONFECTIONERS, she offered a fraudulent identification card and a fraudulent United States Social Security card to the hiring personnel. ORTIZ-BANUELO stated she purchased a fraudulent identification card in Florida and provided the fraudulent identification card to the hiring personnel at NUTRITION BAR CONFECTIONERS at the time of her employment interview. ORTIZ-BANUELO stated that she receives a form W-2 from NUTRITION BAR CONFECTIONERS every year but on the advice of other NUTRITION BAR CONFECTIONERS employees, has never filed income tax forms.

27. On or about April 23, 2025, law enforcement encountered Maynor Abigail NOLASCO-

10

VELASQUEZ, while conducting targeted enforcement efforts in the Oswego County area. Patrol Agents from the United States Border patrol encountered NOLASCO-VELASQUEZ at a residence during a consensual encounter. NOLASCO-VELASQUEZ admitted to being illegally present in the United States. As a result of this, NOLASCO-VELASQUEZ was arrested by the United States Border Patrol and transported to the Border Patrol station in Oswego, New York, for processing and an interview. Upon arrival to the Border Patrol station, NOLASCO-VELASQUEZ waived Miranda rights and agreed to speak with law enforcement with no promise of anything in return from Law Enforcement. At the start of the interview, NOLASCO-VELASQUEZ indicated that he did not understand English and wished to have an interpreter present during the interview, so a Border Patrol agent assisted with the interview

28. NOLASCO-VELASQUEZ stated he illegally entered the United States on May 7, 2022, in Texas. NOLASCO-VELASQUEZ explained that shortly after he entered the United States illegally, he was transported to Cortland, New York, to work on a dairy farm. NOLASCO-VELASQUEZ claimed he currently lives at ⬛⬛⬛⬛⬛⬛⬛ in Fulton, New York. NOLASCO-VELASQUEZ was found to be in possession of fraudulent identification cards but claimed to have never used the Identification cards.

29. NOLASCO-VELASQUEZ stated he had just been hired to start working at NUTRITION BAR CONFECTIONERS on April 28, 2025. NOLASCO-VELASQUEZ explained that he does not have a United States Social Security number and was not asked for any identification while applying to work at NUTRITION BAR CONFECTIONERS. NOLASCO-VELASQUEZ also stated he had previously worked at other locations in Oswego County that are suspected of hiring illegal aliens.

## TIP LINE CALLS

30. On January 28, 2025, your affiant received an anonymous tip from the HSI tip line stating

11

NUTRITION BAR CONFECTIONERS, located at the SUBJECT PREMISE is hiring "illegal immigrants working for facility."

31. On April 3, 2025, your affiant received an anonymous tip from the HSI tip line stating NUTRITION BAR CONFECTIONERS, located at the SUBJECT PREMISE, is "hiring a large amount of illegal immigrants that have fake credentials and some are even underage."

32. On Wednesday, April 9, 2025, your affiant received an anonymous tip from the HSI tip line stating NUTRITION BAR CONFECTIONERS, located at the SUBJECT PREMISE, "The HR hires immigrants without verifying documentation and pays them less than the white peoples."

### NEW YORK STATE DEPARTMENT OF LABOR RECORDS & E-VERIFY

33. On or about June 17, 2025, your affiant received records from the New York State Department of Labor relating to NUTRITION BAR CONFECTIONERS. ████████████ ████████████████████████████████████ These records included a list of employees of NUTRITION BAR CONFECTIONERS at the SUBJECT PREMISE for the quarters 20241 - 20251.

34. Based on these records alone, HSI and Border Patrol were able to determine, through Department of Homeland Security databases and public records databases, that at least 134 of NUTRITION BAR CONFECTIONERS's 224 employees for the first quarter of 2025 were either using a valid Social Security Number that was not assigned to them, a Social Security Number belonging to a deceased United States citizen or a number that was not a valid Social Security Number issued by the Social Security Administration. Specifically, NUTRITION BAR CONFECTIONERS paid wages to fifty-two (52) employees who were utilizing valid Social Security Numbers that were not assigned to them; twenty-two (22) employees who were utilizing Social Security Numbers of deceased U.S. citizens; and sixty (60) employees who were utilizing

invalid Social Security Numbers. Because these employees were utilizing Social Security Numbers not assigned to them, law enforcement was unable to identify the current legal status in the United States, or their current work authorization status for each of the employees. Surveillance of the SUBJECT PREMISE did however identify multiple vehicles registered to some of the same names reported by NUTRITION BAR CONFECTIONERS to New York State Department of Labor as receiving wages in the first quarter of 2025. These individuals, for whom law enforcement has reasonable suspicion to approach and detain in the context of a *Terry* stop to request further information based on what is known about their fraudulent use of social security numbers, are identified below:

| **Name** | **Last Four of SSN** | **Validity of Social Security Number** |
|---|---|---|
| | 0202 | Invalid Social Security Number |
| | 0928 | Valid Social Security Number not assigned to listed employee |
| | 6809 | Invalid Social Security Number |
| | 0972 | Valid Social Security Number not assigned to listed employee |
| | 8427 | Invalid Social Security Number |
| | 5013 | Invalid Social Security Number |
| | 7651 | Invalid Social Security Number |

35. Based on my training, experience and knowledge of this investigation, I know that individuals who are illegally present in the United States and/or do not have current authorization to legally work in the United States, often utilize fraudulent documents, to include Social Security numbers and other identification documents.

36. Additionally, law enforcement was able to determine through these same records that the employees identified above in paragraphs 10 through 26 were utilizing Social Security Numbers that either were valid Social Security Numbers but not issued to them, or numbers not issued by

13

the Social Security Administration:

> a.  Ramon CACERAS-CACERAS: The Social Security Administration researched the Social Security Number used by CACERAS-CACERAS at NUTRITION BAR CONFECTIONERS, which ends in 2892 (*see* paragraph 13, supra), and found the number was not a valid Social Security Number issued by the Social Security Administration.

> b.  Mauro HERNANDEZ-BATZ: The Social Security Administration researched the Social Security Number associated with HERNANDEZ-BATZ's Nutrition Bar earnings as reported to the New York State Department of Labor and found the number was a valid Social Security Number but that it was not assigned to HERNANDEZ-BATZ.

> c.  Maria Celia ORTIZ-BANUELO: The Social Security Administration researched used by ORTIZ-BANUELO and found the number was a valid Social Security number but that it was not assigned to ORTIZ-BANUELO.

37. E-Verify.gov is a web-based system that allows enrolled employers to confirm the identity and eligibility of employees to work in the United States. E-Verify employers verify the identity and employment eligibility of newly hired employees by electronically matching information given by employees on the Form I-9 against records available to the Social Security Administration and the Department of Homeland Security. E-Verify is a voluntary program and is currently an available means to electronically confirm employment eligibility and identity.

38. Your affiant requested information from U.S. Citizenship and Immigration Services ("USCIS"), Verification Division regarding NUTRITION BAR CONFECTIONERS. USCIS reported that NUTRITION BAR CONFECTIONS, located at the SUBJECT PREMISES, is not enrolled as an E-Verify participant.

14

39. Based on my training and experience, as well as previous investigations into the operation of employing illegal aliens, to include encouraging the residence and harboring of aliens in the Northern District of New York, I have learned that employers, like NUTRITION BAR CONFECTIONERS, often keep business records related to payment, transportation, and housing of these unauthorized aliens at workplaces. This includes evidence related to the production and falsification of employment authorization documents, such as templates, ink and printers.

40. Additionally, I know that when an employee starts a new job, the employee is required to fill out a Form W-4, Employee's Withholding Certificate. The W-4 is utilized to determine how much federal income tax will be withheld from the employee's paycheck. The W-4 is maintained solely by the employer and the Internal Revenue Service requires employers to keep an employee's W-4 on file for a minimum of four years. In addition to the W-4, an employer is required to complete and sign a Form I-9, Employment Eligibility Verification, as mandated by the Immigration Reform and Control Act of 1986. The Form I-9 is used to verify the identity and legal authorization to work of all paid employees in the United States. All U.S. employers must ensure proper completion of the Form I-9 for each employee in the United States. Employees must fill out Section 1 of the Form I-9 and present acceptable documentation to verify their identity and work authorization. The employer must complete Section 2 within three days of the employee's starting date at work. The employer is responsible for ensuring that the forms are completed properly and in a timely manner. Employers must update or reverify certain ID documents at or prior to their expiration date. Employers are required to retain Forms I-9 for all current employees and for three years after the date of hire, or one year after the date employment ends, whichever is later.

## SURVEILLANCE

41. Since the beginning of this investigation, law enforcement has observed multiple vehicles in the parking lot of the SUBJECT PREMISE, during operating hours, that bear New York vehicle

15

registrations. Many of these identified vehicles are registered to individuals believed to be illegally present in the United States. Below is a table showing the name of the registered owners of some of the vehicles observed in the parking lot of the SUBJECT PREMISE and the immigration status of those registered owners:

| Date | New York Registration | Registered Owner | Immigration Status |
|------|----------------------|------------------|--------------------|
| January 16, 2025 | | | Believed to be Illegally Present in the United States |
| February 20, 2025 | | | Believed to be Illegally Present in the United States |
| March 10, 2025 | | | Believed to be Illegally Present in the United States |
| July 28, 2025 | | | Believed to be Illegally Present in the United States |
| July 30, 2025 | | | Believed to be Illegally Present in the United States |

42. Based on my training and experience, I know the New York State Green Light Law was enacted on June 17, 2019, and took effect on December 16, 2019. It allows all residents of New York age 16 and older to apply for a standard, not-for-federal purpose, non-commercial driver license or learner permit, regardless of their citizenship or lawful status in the United States.

## COMPUTERS AND/OR COMPUTER DATA

43. This application seeks permission to search and seize documents and other records that might be found on specific computer systems and electronic storage devices at the SUBJECT PREMISE. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis. There is a basis to seize electronic records because I know and understand from my training and experience that most businesses keep electronic records on-site to track employee hours, pay, and other details that would be relevant to the crimes under

investigation in this matter.

44. Based on my knowledge and training, and the experience of an IRS Computer Investigative Specialist ("CIS"), I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

45. I also know that during the search of the SUBJECT PREMISE, it is rarely possible to complete an on-site examination (and in some cases even images) of computer systems and storage devices for a number of reasons, including the following:

    a.  Imaging and forensic analysis of computer systems and storage devices is a highly technical process that requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is rarely possible to bring to the location where the warrant is to be executed all of the necessary technical manuals and specialized equipment necessary to conduct a thorough analysis. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, operating system, or software application being analyzed.

    b.  The analysis of computer systems and storage devices often relies on rigorous procedures designed to maintain the integrity of the evidence and to recover "hidden," mislabeled, deceptively named, erased, compressed, encrypted, or password-protected data, while reducing the likelihood of inadvertent or intentional loss or modification of data. A controlled environment, such as a law enforcement laboratory, is typically required to conduct such an analysis properly.

    c.  The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to analyze (or at times image) the data during the execution of the physical search of the premises. The hard drives commonly included in mere desktop computers are capable of storing millions of pages of text; the storage capacity of servers is often much greater.

46. Due to the volume of data at issue and the technical requirements set forth above, it may be necessary for the above-referenced computer systems and storage devices to be seized and

analyzed subsequently by a qualified computer specialist in a laboratory setting. Under certain circumstances, however, some types of computer systems and storage devices may be imaged and a copy of the data may be seized, thus eliminating the need for its removal from the premises. A determining factor is whether a particular device can be more readily, quickly, and thus less intrusively analyzed off-site, with due consideration given to preserving the integrity of the evidence. This, in turn, is often dependent on the size of the computer systems and storage media to be analyzed; and this is frequently dependent upon the particular type of computer system or storage device involved.

47. Based upon my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of computers, I am aware that forensic analysis of computer systems and storage devices taken from the premises commonly requires agents to seize most or all of a computer systems and storage devices, in order for a qualified computer expert to retrieve the data accurately in a laboratory or other controlled environment. Therefore, in those instances where computer systems and storage devices are removed from the premises in order to retrieve data properly, the agents must seize all of the computer systems and storage devices. If, after imaging and inspecting the computer systems and storage devices, it becomes apparent that these items are no longer necessary to retrieve and preserve the data as evidence, and are not otherwise sizeable, such equipment and/or materials will be returned within a reasonable period of time.

48. The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying the file directories and any individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing pertinent files, in order to locate the evidence authorized

18

for seizure by the warrant); conducting a file-by-file review of the data; examining all the structured, unstructured, deleted, and free space data on a particular piece of media; opening or reading the first few pages of each file in order to determine their precise contents; scanning storage areas to discover and possibly recover deleted data; scanning storage areas for deliberately hidden files; and performing electronic keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.  The forensic analysis of the electronic information seized during the search can take weeks or months, depending on the volume of data stored in the computers.

49. In light of these concerns, I hereby request the Court's permission to seize all computer hardware, storage media, software and associated peripherals on site that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site forensic analysis of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to examine the hardware, media, or peripherals on-site for this evidence.  Furthermore, to the extent practical, law enforcement will make available to the concerned individuals "bit-stream" or "cloned" copies of the seized computer's hard-drives within a reasonable amount of time after the execution of the search warrant to minimize any impact that seizure may have on their personal and financial operations.  If after inspecting the computer system, including all input-output devices, system software, and instruction manuals, the CIS determines that these items are no longer necessary to retrieve and preserve the computer evidence, I will return those items as soon as practicable.

## CONCLUSION

50. Based on the above information, I respectfully submit that there is probable cause to believe that evidence, contraband, fruits, and/or instrumentalities of violations of Title 8, United States Code, Section 1324 (hiring illegal aliens, smuggling illegal aliens, transporting illegal aliens or harboring illegal aliens), Title 18, United States Code, Section 1028 (Fraud and Related Activity in Connection with Identification Documents, Authentication Features and Information); and Title 42, United States Code, Section 408(a)(7)(B) (Use of a False Social Security Number) (collectively, the "TARGET OFFENSES"), as further described in Attachment B, are presently located at NUTRITION BAR CONFECTIONERS at the SUBJECT PREMISE.

51. I therefore respectfully request that this Court issue the requested search warrant authorizing a search of the SUBJECT PREMISE, as further described in Attachment A for the items listed in Attachment B.

ATTESTED TO BY THE APPLICANT BY VIDEOCONFERENCE IN ACCORDANCE WITH THE REQUIREMENTS OF RULE 4.1 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE.

Respectfully submitted,

Andrew McCoy
Special Agent
Homeland Security Investigation

I, the Honorable Hon. Thérèse Wiley Dancks, United States Magistrate Judge, hereby acknowledge that this affidavit was attested by the affiant by videoconference on August 28, 2025 in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Hon. Thérèse Wiley Dancks
United States Magistrate Judge

20

## ATTACHMENT A

### LOCATION TO BE SEARCHED

Nutrition Bar Confectioners facility, located at 12351 State Route 34, Cato, NY, a 60,000 square foot facility, located on an 80 Acre property, as depicted in the pictures below:







**ATTACHMENT B**
**ITEMS TO BE SEIZED**

1)      Items evidencing violations of Title 8, United States Code, Section 1342(a) (Employing

Unauthorized Aliens), Title 18, United States Code, Section 1028 (Fraud and Related Activity in

Connection with Identification Documents, Authentication Features and Information); and Title

42, United States Code, Section 408(a)(7)(B) (Use of a False Social Security Number), to include

the following:

    a.  All records pertaining to conducting financial transactions involving the employment of
       individuals;

    b.  Computers, laptops, hard drives, computer disks, compact disks, jump drives, thumb drives
       or other medium utilized to store data or information and the contents of those items.

    c.  Electronic or paper records, to include computers,  pertaining to the employment,
       termination, payment of all current and former employees;

    d.  Equipment used and commonly associated with the manufacturing of fraudulent ID cards,
       to include printers, ink, blank card stock, ink cartridges;

    e.  Any books, records, receipts, notes, ledgers, journals, travel documents and other papers
       relating to the employment of individuals not legally present in the United States;

    f.  Addresses and/or telephone books, the contents of any telephones; caller ID boxes attached
       to telephones and papers reflecting names, addresses, and/or telephone numbers; and
       telephone records reflecting local and long distance calls;[1]

    g.  Bank statements, tax records, financial statements and records, safe deposit keys, storage

---

[1] This warrant does not seek to search individual cell phones owned or possessed by employees,
owners, or managers.

unit keys, receipts, and other books and records, including records related to the purchase of real property and personal property (including automobiles, boats, jet-skis, snowmobiles, motorcycles and all-terrain vehicles), safes, lock boxes, gun safes, safe deposit boxes and, in general, any records or documents evidencing the obtaining, transfer, concealment, or expenditure of money or other assets, and/or demonstrating the laundering or use of monies generated by the employment of illegal aliens

h. Photographs of people, assets, or objects that may be related to the employment of illegal aliens or the use of fraudulent employment documents;

i. Personal effects tending to establish proprietary interest, including but not limited to, personal identification, driver's licenses, vehicle registration certificates, passports, birth certificates and deeds;

j. Employee identification documents;

k. Forms W-4 and I-9 and accompanying documents;

l. Records of business tax information including business tax returns for the tax years 2020 through the present, including W-2 forms, 1099 forms, income schedules, bank statements, cash receipts, wire transfer records, foreign bank accounts, safe deposit box records, business expense schedules, accounts receivable and payable schedules, loans, credit card information including credit card statements and applications, canceled checks or similar documents for Nutrition Bar Confectioners LLC;

m. Business records relating to Nutrition Bar Confectioners LLC, which identify employees, employee identification, employee payment methods, employee housing;

n. Employee files;

o. Business ledgers which include the amount wages paid to employees or subcontractors,

wire transfers and expenses;

p.  All correspondence between Nutrition Bar Confectioners LLC and its employees;

q.  All records concerning the business activities, payroll and/or employees of Nutrition Bar Confectioners LLC;

r.  Any records and communications tending to demonstrate knowledge of the requirements for hiring authorized individuals for employment in the United States in compliance with federal law;

s.  Records concerning any activity related to the disguising or obscuring of the employment of illegal aliens;

t.  Records concerning the identity and role of persons who collaborated, conspired, or assisted (knowingly or unknowingly) with the commission of the crimes under investigation, including records that help reveal their whereabouts;

u.  Safe deposit records and keys;

v.  Records of the acquisition or ownership of real property by or on behalf of Nutrition Bar Confectioners LLC and/or the principals of Nutrition Bar Confectioners LLC such as deeds, mortgages, contracts, closing statements, records of payment or similar documents;

w. Contents of any safes to include any and all documents and cash otherwise authorized under the search warrant;

2)    For any computer, communication device, or storage medium whose seizure is otherwise authorized by this warrant, and any computer, communication device, or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things

described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b. evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the lack of such malicious software;

d. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e. evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f. evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h. evidence of the times the COMPUTER was used;

i. passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j. documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k. records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

m.  contextual information necessary to understand the evidence described in this attachment.

During the execution of this search warrant, the law enforcement personnel are authorized to depress the fingerprints and/or thumbprints of persons at the locations to be searched onto the Touch ID sensor of any Apple iPhone, iPad, or other Apple brand device with Touch ID in order to gain access to the contents of any such device.

3)    Routers, modems, and network equipment used to connect computers to the Internet.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical memory devices.