**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

UNITED STATES OF AMERICA,

v.                                                              5:25-cr-00424 (BKS/TWD)

ARGENTINA JUAREZ-LOPEZ,

                                        Defendant.

_____

**Appearances:**

_For the United States of America:_
Michael F. Perry
Michael J. Whalen
Assistant United States Attorneys
United States Attorney's Office
100 South Clinton Street
Syracuse, New York 13261

_For Defendant:_
Paul J. Tuck
Paul Tuck Attorney at Law PLLC
PO Box 44
Manlius, New York 13104

**Hon. Brenda K. Sannes, Chief United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Federal agents arrested Defendant Argentina Juarez-Lopez on September 4, 2025, while she was at work in a Cato, New York factory owned by Nutrition Bar Confectioners ("NBC"). A grand jury subsequently indicted her on one count of illegal reentry into the United States, in violation of 8 U.S.C. § 1326(a). (Dkt. No. 13). Defendant moves to suppress evidence agents obtained after her arrest. (Dkt. No. 23). The motion is fully briefed. (Dkt. Nos. 23-1, 33, 39). For the reasons that follow, the motion is granted.

II.    **FACTS**[1]

A.    **The NBC Investigation**

In early 2025, the Government began investigating NBC for violating federal immigration law. (*See* Dkt. No. 23-8, at 1; Dkt. No. 33-1, at 3–4, 17; Dkt. No. 33-4, at 3–5, 13). As part of this effort, deputy sheriffs surveilled roads around the factory, stopped two NBC employees who committed traffic violations, and asked about their immigration status. (*See* Dkt. No. 33-1, at 4–6, 8–9; Dkt. No. 33-4, at 4–6, 9–10). With help from U.S. Customs and Border Patrol ("CBP"), the deputies determined that both had illegally entered the United States. (*See* Dkt. No. 33-1, at 5, 8; Dkt. No. 33-4, at 5, 9). Subsequent searches and questioning revealed that one employee had used a non-existent social security number and fraudulent identification documents in connection with his NBC employment, and that NBC had hired the other without verifying his immigration status. (Dkt. No. 33-1, at 6–10; Dkt. No. 33-4, at 6–10). Officers also observed vehicles in the factory parking lot "registered to individuals believed to be illegally present in the United States." (Dkt. No. 33-1, at 16–17; Dkt. No. 33-4, at 13–14).

Interviews of two other NBC employees provided additional information. (Dkt. No. 33-1, at 11–12; Dkt. No. 33-4, at 11–13). The first—who had "never had legal status to be present or work in the United States"—explained that she also used fraudulent documents when hired at NBC, and that there was a person in Fulton, New York who would help immigrants unauthorized to work in the United States apply for NBC employment. (Dkt. No. 33-1, at 11; Dkt. No. 33-4, at 12). The second was also unauthorized to work in the United States and had fraudulent identification documents. (Dkt. No. 33-1, at 11–12; Dkt. No. 33-4, at 12–13).

---

[1] The facts are drawn from the parties' affidavits and exhibits submitted in connection with Defendant's motion. *See United States v. Hines*, 140 F.4th 105, 108 n.1 (2d Cir. 2025). The parties agree that there are no material factual disputes requiring an evidentiary hearing. (Dkt. No. 33, at 25; Dkt. No. 39, at 6, 18 n.11).

Further, Homeland Security Investigations ("HSI") received three anonymous tips that NBC employed immigrants unauthorized to work in the United States. (Dkt. No. 33-1, at 12–13; Dkt. No. 33-4, at 14). And state labor department records reflected that at least 134 NBC employees "were either using a valid social security number that was not assigned to them, a social security number belonging to a deceased United States citizen[,] or a number that was not a valid social security number issued by the Social Security Administration." (Dkt. No. 33-1, 13–15 (capitalization omitted)). HSI also confirmed that NBC did not participate in a federally administered "web-based system that allows enrolled employers to confirm the identity and eligibility of employees to work in the United States." (*Id.* at 15).

### B.    The Government's Warrant Applications

Armed with this evidence, the Government applied for two warrants to search the NBC factory. (Dkt. No. 33-1, at 1–3; Dkt. No. 33-4, at 1–3). One application sought a Federal Rule of Criminal Procedure 41 warrant to search for "evidence, contraband, fruits, and instrumentalities of violations of" 8 U.S.C. § 1324, 18 U.S.C. § 1028, and 42 U.S.C. § 408(a)(7)(B).[2] (Dkt. No. 33-1, at 1–3). Among the items the Government wished to search for and seize were financial and employment records. (*See id.* at 17, 25–29). This application did not seek permission to arrest any person found in the factory. (*See id.* at 1).

The Government's other application sought an administrative warrant "authorizing a search for the purpose of interrogation and civil administrative arrest of illegal aliens, pursuant to

---

[2] These provisions criminalize, respectively, the employment, smuggling, transport, or harboring of immigrants unlawfully present in the United States; fraud in connection with identification documents; and the use of a false social security number. As to the first provision, the warrant application was inconsistent—sometimes referring to § 1324, and other times referring to "8 U.S.C. § 1342(a)," a statute that does not appear to exist. (*See* Dkt. No. 33-1, at 1, 2, 21, 25). The warrant itself, however, listed only the nonexistent statute. (*See* Dkt. No. 33-2, at 1, 6). The parties have not raised this issue, and Defendant has not challenged this warrant, so the Court has not considered it.

8 U.S.C. §§ 1103, 1357."[3] (Dkt. No. 33-4, at 1). The application sought, as now relevant, to authorize law enforcement to enter the factory to "take such actions with respect to aliens unlawfully within the United States as authorized by" law. (*Id.*). Specifically, the affiant requested permission to "*approach and question* suspected aliens concerning their status and to arrest, without a warrant, aliens illegally present in the United States." (*Id.* at 2–3 (emphasis added); *see also id.* at 15 & n.5 (same)).

With this application, the Government submitted a memorandum of law explaining the legal basis for the administrative warrant. (Dkt. No. 33-3). The memorandum explained that—as in other contexts where courts used reasonable "statutory construction . . . to permit administrative agencies to carry out the tasks assigned to them"—the warrant was "necessary to enable [the Department of Homeland Security ("DHS")] to carry out its remedial responsibilities" under the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.* (*Id.* at 2–6). The Government noted that (over three decades ago) two courts of appeals had sanctioned such warrants in the immigration context. (*Id.* at 4–5 (first citing *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211 (D.C. Cir. 1981); then citing *Int'l Molders' & Allied Workers Loc. Union No. 164 v. Nelson*, 799 F.2d 547 (9th Cir. 1986))). It also acknowledged, however, that a magistrate judge in the Southern District of Texas had recently refused to issue such a warrant, concluding that the D.C. Circuit's reasoning in *Blackie's* had been flawed and, in any event, undermined by subsequent statutory developments. (*Id.* at 5 (citing *In re Sealed Search Warrant Application*, 784 F. Supp. 3d 970 (S.D. Tex. 2025))).

---

[3] According to the Government, it submitted this application "out of an abundance of caution and to ensure judicial authorization of the planned questioning of employees." (Dkt. No. 33-3, at 1–2 n.2). Although officers could engage in consensual questioning in executing the Rule 41 warrant, the Government explained, it was possible that questioning all employees would take longer than necessary to seize the records, or that some employees might "not be near the location of the records sought to be seized under the Rule 41 warrant." (*Id.*).

Importantly, the memorandum clarified that the "purpose" of the administrative warrant application was "to obtain authority to search" the factory. (*Id.* at 6). The separate authority to question and arrest would stem not from the warrant, but from "statute and case law." (*Id.*). Under that authority, the Government explained, agents could: (1) "engage in systematic *consensual* questioning of employees"; (2) "detain a person absent valid seizure or arrest warrants or valid exigent circumstances only if they possess reasonable, articulable and individualized suspicion of violations of immigration or criminal law"; and (3) "make warrantless civil immigration arrests of aliens unlawfully present in the United States *based on probable cause.*" (*Id.* at 6–7 (emphases added)).

A magistrate judge issued both warrants on August 28, 2025. (Dkt. No. 33-2 (Rule 41 warrant); Dkt. No. 33-5 (administrative warrant)). Consistent with the Government's application, neither warrant conferred authority to detain or arrest any person. (Dkt. No. 33-2 at 1, 6–10; Dkt. No. 33-5, at 1).

## C.    The September 4 Search

Law enforcement searched the NBC factory on September 4, 2025. (Dkt. No. 23-8, at 2; Dkt. No. 33-6, ¶ 2). Roughly 60 agents and officers from numerous federal and county agencies, including HSI and CBP, participated in the search. (Dkt. No. 23-9, at 3; Dkt. No. 33-6, ¶¶ 2, 6). HSI and other agents wore body cameras; others, including CBP agents, did not. (Dkt. No. 33-6, ¶ 7; Dkt. No. 33-7, ¶ 2; Dkt. No. 33-8, ¶ 2). The Court's description of the search is drawn primarily from body camera footage, an HSI report of investigation, and affidavits submitted by Defendant and participating agents.[4]

---

[4] Like the parties, the Court cites to the body camera footage using the time stamps reflected in the video. Additionally, as will become evident below, the Court notes that the footage does not show the entire search. The parties have submitted video from only five HSI agents, none of which depict the entire period the agents wearing the cameras

Agents arrived at the factory around 9:18 a.m. (Dkt. No. 23-11, at 9:18:37; Dkt. No. 23-14, at 9:18:50; *see also* Dkt. No. 23-8, at 2). They entered the front door after an NBC supervisor unlocked it; another group of agents "entered through the rear doors" around the same time. (Dkt. No. 23-8, at 2: *see also* Dkt. No. 23-11, at 9:19:52–19:57; Dkt. No. 23-12, at 9:20:01–20:04; Dkt. No. 23-14, at 9:20:01; Dkt. No. 23-15, at 9:20:20). Once inside the factory lobby and offices, several agents who had come through the front door entered a hallway leading to the production area. (Dkt. No. 23-11, at 9:20:08–20:23; Dkt. No. 23-12, at 9:20:10–20:13; Dkt. No. 23-14, at 9:20:11; Dkt. No. 23-15, at 9:20:51). Meanwhile, agents leading the operation learned from the NBC supervisor that 160 employees were present; they had only expected 60. (Dkt. No. 23-11, at 9:20:12–20:23; Dkt. No. 33-6, ¶¶ 6, 8). Minutes after entering, these agents directed the supervisor to make an announcement to all employees—first in English, then repeated by an agent in Spanish—that police had arrived with a warrant, and directing them to report to the factory's break room. (Dkt. No. 23-11, at 9:20:23–20:41, 9:21:47–21:52, 9:22:20–23:14; *see also* Dkt. No. 33-6, ¶ 9). The agents also directed the supervisor to have employees "safely turn off all equipment." (Dkt. No. 33-6, ¶ 9; *see also* Dkt. No. 23-11, at 9:21:35–21:42, 9:22:34–22:39).

During and after the announcement, agents who had entered the hallway swept the factory's production area and warehouse for employees, ensuring all had reported to the break room. (*See* Dkt. No. 23-11, at 9:26:02–28:05; Dkt. No. 23-12, at 9:20:20–35:40; Dkt. No. 23-14, at 9:20:11–39:29; Dkt. No. 23-15, at 9:20:50–36:21; *see also* Dkt. No. 33-6, ¶¶ 5, 10–11, 13–14, 17). Every agent carried a gun and wore a vest; many also wore face coverings, and some were dressed in uniforms a layperson might reasonably perceive as military fatigues. (*See, e.g.*, Dkt.

---

were present at the factory, and some of which contain time gaps. (*See* Dkt. No. 23-11 (gap from 9:28:13 to 10:14:41); Dkt. No. 23-12 (gap from 9:45:57 to 9:50:15); Dkt. No. 23-13 (starting at 9:36:57)).

No. 23-11, at 9:20:08–20:23; Dkt. No. 23-15, at 9:27:56, 9:36:10; *cf.* Dkt. No. 23-16, ¶¶ 6, 7

(Defendant's affidavit describing agents wearing "what looked like military-style body armor")).

According to HSI Special Agent Andrew McCoy, whose declaration the Government submitted

in opposition to Defendant's motion, the sweep was needed to "locate all individuals present, to

identify locations where evidence might be located, to preserve evidence, and for officer safety

reasons." (Dkt. No. 33-6, ¶¶ 10, 14). Special Agent McCoy "took a lead role in planning" the

search and "organized logistical and safety meetings in advance" of September 4, during which

"officer safety was frequently discussed." (*Id.* ¶¶ 2, 6).

Despite this planning, the agents' sweep of the factory soon became disorganized. Body

camera footage reflects that, at multiple points, some agents were unaware of which areas had

already been swept. (Dkt. No. 23-14, at 9:25:52–25:58, 9:33:00–33:04, 9:34:20–34:28, 9:36:35–

36:50, 9:38:27–38:32; Dkt. No. 23-15, at 9:26:56–27:03, 9:28:35–28:40, 9:30:18–30:28).

Apparently describing this, one HSI agent remarked: "Drew it up how we thought we were

gonna do it and everyone just starts walking through, [and] I'm like, well, there goes that." (Dkt.

No. 23-14, at 9:31:22–31:27). The same agent multiple times described the sweep as "a

shitshow."[5] (*See id.* at 9:20:42–20:47, 9:25:23–25:27, 9:30:18).

Defendant avers that—at around 9:15 a.m., just before the sweep began—she "was

stationed in the production area of the factory at a machine that packs bars." (Dkt. No. 23-16,

¶ 4). Shortly thereafter, she "heard [a] commotion and saw a co-worker that [she] knew running

through the production area stating that police had entered the factory." (*Id.* ¶ 5). Defendant then

left her "post at the machine in the production area but . . . quickly saw a police officer walking

towards" her. (*Id.* ¶ 6). She "heard him stay '[s]top,'" at which point she "turned and started

---

[5] Also during the sweep, this agent appeared to jest with colleagues about removing his body camera, and then did so for roughly a minute. (*See* Dkt. No. 23-14, at 9:35:10–36:23).

walking towards another area of the factory and was met by another police officer." (*Id.* ¶¶ 6–7). Defendant "was startled and stopped moving"; the second officer "started making hand motions to [her] and other colleagues indicating that [they] all needed to move towards the" break room. (*Id.* ¶ 8). She followed this officer's instructions; all employees were "herded" to the breakroom. (*Id.* ¶ 10; *see also* Dkt. No. 23-14, at 9:23:41–24:16; Dkt. No. 23-15, at 9:24:07–25:02).

When Defendant arrived at the break room, "there were 40-50 employees already" there; agents stood "near the [two] doors . . . making sure people could not leave." (Dkt. No. 23-16, ¶¶ 11, 12). Defendant describes the room as "chaotic," "crowded, and hot," and states that she "could hear police officers yelling at [her] coworkers to 'sit down' and 'stay here.'" (*Id.* ¶ 13). Agents told employees "that [they] would each have to speak with an officer individually." (*Id.*).

Defendant's arrival to the break room does not appear to have been recorded by body cameras. Shortly after law enforcement entered the front door, an HSI agent can be heard directing the roughly 20 employees already in the break room to sit down and remain there. (*See* Dkt. No. 23-12, at 9:20:44–21:37, 9:21:51–21:58). Later, the same agent returned to the break room; by that time, multiple agents had gathered outside the doors. (*Id.* at 9:29:15–29:28). At some point, agents directed employees in the break room to self-identify as U.S. citizens or non-citizens authorized to work. (*See id.* at 9:36:13–37:27; Dkt. No. 23-13, at 9:37:59–39:10). Body camera footage reflects that employees spoke with agents at the break room doors, who directed them elsewhere after confirming their status. (*See* Dkt. No. 23-12, at 9:36:13–37:27; Dkt. No. 23-13, at 9:37:59–39:10).

The employees outside the break room were sorted into different groups. Agents lined up U.S. citizens who were factory supervisors on a wall opposite the break room doors. (*See* Dkt. No. 23-12, at 9:36:38–36:46; Dkt. No. 23-13, at 9:38:00–38:04, 9:38:45–38:54; Dkt. No. 23-15,

at 9:38:03–38:07). Non-supervisor citizens were sent into a separate hallway and sorted in one group; non-supervisor employees who claimed to have work authorization were sent to the same hallway and sorted in another group.[6] (*See* Dkt. No. 23-12, at 9:37:33–40:05). At some points in the sorting however, the employees became "mixed up." (Dkt. No. 23-13, at 9:39:09–39:35; *see also* Dkt. No. 23-12, at 9:37:39–39:55). Eventually, the agents concluded that no U.S. citizens were left in the break room. (Dkt. No. 23-12, at 9:40:07–40:12; *see also* Dkt. No. 23-13, at 9:39:29–39:35, 9:39:49). After directing the employees remaining in the break room to move to the left—informing them that each would be individually interviewed—agents brought back to the right side of the break room some non-citizen employees who had previously been sorted in the hallway. (*See* Dkt. No. 23-12, at 9:40:16–43:37; Dkt. No. 23-13, at 9:42:14–43:44).

Agents then questioned the remaining breakroom employees who had not self-identified, moving them after each interview from the left of the room to the right, where some employees from the hallway also stood. (*See* Dkt. No. 23-12, at 9:43:42–45:57; Dkt. No. 23-13, at 9:43:44–55:20; Dkt. No. 23-15, at 9:51:03–56:14). The employees on the left side of the room formed a line, and CBP agents waved each up individually to be briefly interviewed. (*See, e.g.*, Dkt. No. 23-13, at 9:45:14–47:54). In one interview, an employee can be heard referencing her attorney; the agent, however, continued his questioning before sending her to the right side of the room. (*See id.* at 9:44:56–45:11, 9:46:00–46:04, 9:46:41–46:43).

A CBP agent (without a body camera) interviewed Defendant for roughly ten seconds at 9:52 a.m. (*Id.* at 9:52:49–52:59; Dkt. No. 23-15, at 9:52:49–52:59). In her affidavit, Defendant states that the agent asked her two questions—what country she was from and whether she had

---

[6] At times, agents tried to electronically verify whether these non-citizens had work authorization, "but the reception was spotty," (Dkt. No. 33-7, ¶ 6; *see also* Dkt. No. 23-15, at 9:48:27–49:11), so agents "did not identify all the employees through phone biometrics that day on site," (Dkt. No. 33-7, ¶ 6).

"documents"—to which she replied twice that she "wanted to speak to an attorney." (Dkt. No. 23-16, ¶ 15). As the Government now concedes, (Dkt. No. 33, at 6), footage from two body cameras worn by HSI agents reflects that Defendant referenced an attorney. (*See* Dkt. No. 23-13, at 9:52:51–52:53; Dkt. No. 23-15, at 9:52:51–52:53). Defendant has also submitted an affidavit from a Spanish interpreter who reviewed this footage and states as follows:

> I heard a law enforcement agent address a woman I recognize as Argentina Juarez-Lopez, the defendant in this action. The agent stated in Spanish, "La próxima, la próxima. ¿De qué país eres?" (in English: "Next one, next one. What country are you from?"). Ms. Juarez-Lopez responded in Spanish, "Quiero un abogado." (in English: "I want an attorney."). The agent then asked another question which was unintelligible in the recording. Ms. Juarez-Lopez again responded, "Necesito un abogado." (in English: "I need an attorney.").

(Dkt. No. 23-18, ¶¶ 1, 3, 5). After this interview, the CBP agent directed Defendant to the right side of the break room. (*Id.* ¶ 5; *see also* Dkt. No. 23-13, at 9:52:59; Dkt. No. 23-15, at 9:52:59). Defendant avers that she had no "other conversations with any police officers while [she] was in the breakroom either before or after [this] interaction." (Dkt. No. 23-16, ¶ 16). She further states:

> At no time during my interaction with police did I admit to being in the country illegally or did I admit to not having any documents that would allow me to enter or remain in the United States legally. At no time did any officer learn my name, my country of birth, my immigration status, or any other information about me.

(*Id.* ¶ 17). Defendant remained in the break room "for at least an hour." (*Id.* ¶ 19). Those at the right side of the room—which one HSI agent identified as the group from which they "need[ed] further information," (Dkt. No. 23-15, at 9:51:20–51:30)—were among the employees whom the agents eventually arrested and transported to a CBP station in Oswego. (Dkt. No. 23-16, ¶ 18; *see also* Dkt. No. 23-9, at 3; Dkt. No. 33-8, ¶¶ 3–4; Dkt. No. 33-9, ¶ 4). As far as Defendant was aware, no agents "ask[ed] anyone any other questions about their immigration status"; instead, "all were stuck in the [break room] until small groups were led out to be transported away from the factory." (Dkt. No. 23-16, ¶ 18). Defendant was "escorted to the entrance of the factory along

with several other female coworkers"; "officers searched [her] and told [her] to turn off [her] cell phone," without telling Defendant where she was going or "anything" else, before the van departed for Oswego.[7] (*Id.* ¶¶ 19–20).

None of the body camera footage submitted depicts the search for records authorized by the Rule 41 warrant. However, it appears that agents conducted this search after each of the employees had been interviewed, while they waited in the break room.[8] (*See* Dkt. No. 23-14, at 9:44:45–45:25 (agents discussing assignments for the Rule 41 warrant search); Dkt. No. 23-11, at 10:15:43–16:31 (lead agents discussing plans for the Rule 41 warrant search)).

Following the search, "57 people were arrested for being illegally present in the United States." (Dkt. No. 23-8, at 2).

### D.    Defendant's Custody at the CBP Station

At the Oswego CBP station, agents directed Defendant to sit on a bench across from three holding cells—two "large" and full of men and women, respectively, and one "very small." (Dkt. No. 23-16, ¶ 21). Defendant waited on the bench for a period of time—during which she was forced to use a metal toilet in one of the large cells with "no door or privacy" in front of many coworkers—"until a police officer called [her] to another area." (*Id.* ¶¶ 22–23). There, agents made her disclose her name and birth date before photographing and fingerprinting her. (*Id.* ¶¶ 23–24). Subsequently, the agents put Defendant in the "very small" cell with another woman,

---

[7] Defendant avers that, before the van departed, "police wrapped a chain around [her] waist and handcuffed [her] to the chain." (Dkt. No. 23-16, ¶ 20). One CBP agent who participated in the search states, in contrast, that he "did not see any employees in handcuffs as they came out of the building with the exception of a few males" who he understood had been "handcuffed due to noncompliant behavior." (Dkt. No. 33-8, ¶ 3). The agent further avers that "[m]ost of the people who were detained at the [factory] had their hands put into soft restraints," not handcuffs. (*Id.* ¶ 4). He also notes that "[s]ome of the women were not restrained at all for transport." (*Id.*).

[8] Agents released some employees who they determined to be U.S. citizens before the Rule 41 warrant search. (*See* Dkt. No. 23-12, at 9:50:15–51:10). They also handcuffed an "adult male" who attempted to flee. (Dkt. No. 33-7, ¶ 3; *see also* Dkt. No. 23-11, at 9:25:03–25:11).

where she remained until September 7. (*Id.* ¶¶ 26–27). Defendant could not leave the cell at all during that time; she and the other detained woman were given blankets and foam mattresses, "but there was not enough room to fully lay out." (*Id.* ¶ 28). Defendant further avers: "During this time, I had no idea where I was, where I was going, [or] what was going to happen to me." (*Id.*). On September 7, Defendant was put in the larger cell—by that time with "far fewer" people—where she met "several other women" who "had been separated from their young children after the" search; they also "had not been permitted to call anyone and . . . had no idea what was happening." (*Id.* ¶ 29). Defendant appeared in federal court on September 8—four days after she had been arrested—where she was told for the first time that she was being charged with a crime. (*Id.* ¶ 30).

### E.    Representations in the Affidavit Supporting the Criminal Complaint and the DHS Report

There is no evidence in the record supporting representations made to the Court, and in a DHS report, concerning the agents' encounter with Defendant at the factory. On September 8, 2025, CBP Agent Foster Rubinstein submitted an affidavit in support of a criminal complaint charging Defendant with illegal reentry in violation of 8 U.S.C. § 1326(a). (*See* Dkt. No. 1, at 2). CBP Agent Rubinstein stated that, "*[w]hile on-scene*, [a]gents detennined [sic] that [Defendant] is a citizen of Guatemala and is present in the United States illegally." (*Id.* (emphasis added)). A DHS report dated September 8 stated that, during the search, Defendant "was encountered during the operation"; "was questioned as to her citizenship and nationality"; and "freely admitted to being in the United States illegally."[9] (Dkt. No. 23-9, at 3).

---

[9] The report listed the following arresting agents: Daniel Hutchings, Charlie Rodriguez, Nicholas Mulzoff, Edgar Lorenzo, and Javier Lorenzo. (Dkt. No. 23-9, at 2). Only one, Mulzoff, has submitted an affidavit in connection with Defendant's motion, but it does not discuss any interaction with Defendant. (*See generally* Dkt. No. 33-8). The list did not include the CBP agent who interviewed Defendant in the breakroom. (*Compare* Dkt. No. 23-15, at 9:52:49–52:59 (depicting Defendant's interview with CBP agent), *with* Dkt. No. 23-12, at 9:45:35–45:45 (depicting same CBP

The DHS report reflects that, according to Defendant's immigration file, she is a Guatemalan citizen previously removed from the United States in June 2024. (*Id.* at 1, 3). She is also subject to an immigration detainer. (*See* Dkt. No. 23-10).

## III.    DISCUSSION

Defendant moves to suppress her "statements, fingerprints, a photo taken of her, any report of investigation, and the immigration file that is linked to those fingerprints." (Dkt. No. 23-1, at 8). The Government opposes the motion. (Dkt. No. 33, at 3).

The Fourth Amendment prohibits unreasonable seizures. U.S. Const. amend. IV. "[I]t is uncontroversial that the Fourth Amendment applies to aliens and citizens alike." *Cotzojay v. Holder*, 725 F.3d 172, 181 (2d Cir. 2013). On a motion to suppress, a defendant bears the initial burden of establishing that she was subjected to a warrantless search or seizure. *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)). Once the defendant has met that burden, the burden shifts to the Government to demonstrate by a preponderance of the evidence that the challenged search or seizure did not violate the Fourth Amendment. *See United States v. Murphy*, 778 F. Supp. 2d 237, 240 (N.D.N.Y. 2011) (citing *Arboleda*, 633 F.2d at 989), *aff'd*, 703 F.3d 182 (2d Cir. 2012).

### A.    Seizure

The Court must first determine the points at which law enforcement seized Defendant within the meaning of the Fourth Amendment. The Government acknowledges that, at the beginning of the search, "officers initially and briefly seized all employees" when they entered the factory. (*See* Dkt. No. 33, at 15 n.10 (emphasis omitted)). And in the context of the sweep— where agents' actions made clear that employees were not free to leave—Defendant herself was

---

agent with visible name patch reading "J. Di Bella"); *see also* Dkt. No. 23-9, at 2 (list of arresting agents not including any named "Di Bella")).

seized when, as described above, she complied with the second officer's direction to stop and move to the break room. *See Dancy v. McGinley*, 843 F.3d 93, 108 n.11 (2d Cir. 2016) (citing *United States v. Simmons*, 560 F.3d 98, 105–06 (2d Cir. 2009)). Additionally, the parties agree that this initial seizure ripened into an arrest when agents transported Defendant to the Oswego CBP station. (*See* Dkt. No. 23-1, at 29; Dkt. No. 33, at 20; Dkt. No. 39, at 12).

### B.    Reasonableness

Next, the Court must assess whether these seizures were reasonable, as required by the Fourth Amendment. To be reasonable, a seizure "ordinarily" requires "individualized suspicion of wrongdoing." *See Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir. 2009) (quoting *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000)). Generally, brief investigatory detentions (often referred to as *Terry* stops) require reasonable suspicion, and arrests require probable cause. *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995); *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022). Even without individualized suspicion, however, officers executing search warrants may detain occupants "on the premises during the execution." *Bailey v. United States*, 568 U.S. 186, 193–94 (2013) (citing *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981)); *Rivera v. United States*, 928 F.2d 592, 606 (2d Cir. 1991). The interests justifying such suspicion-less detentions are "officer safety, facilitating the completion of the search, and preventing flight." *Bailey*, 568 U.S. at 194.

### 1.    The Initial Seizure

Neither party disputes that the Rule 41 warrant was supported by probable cause to allow law enforcement to enter and search the factory for records. (*See* Dkt. No. 23-1, at 26; Dkt. No. 33, at 12–13). Rather, Defendant first challenges the administrative warrant's constitutionality. (*See* Dkt. No. 23-1, at 19–24). But even assuming that warrant complied with the Fourth Amendment—an issue which is far from clear cut, *see In re Sealed Search Warrant Application*,

14

784 F. Supp. 3d at 973–76—the agents plainly exceeded its contemplated scope. As the Government told the magistrate judge and reiterates in opposing Defendant's motion, the warrant allowed agents to enter the factory to "engage in systematic *consensual* questioning of employees." (Dkt. No. 33-3, at 6 (emphasis added) (citing *INS v. Delgado*, 466 U.S. 210, 216–19 (1984)); Dkt. No. 33, at 14 (same)). The affidavit in support of the warrant application similarly averred that agents would "*approach and question* suspected aliens concerning their status." (Dkt. No. 33-4, at 2–3, 15 n.5 (emphasis added)).

But as described above, agents' actions differed drastically from these representations. Instead of approaching and consensually questioning employees, the Government admits that agents (without individualized suspicion) "initially and briefly seized all employees" shortly after entering the factory. (Dkt. No. 33, at 15 n.10 (emphasis omitted)). After gathering all employees in the breakroom, they first directed employees to self-identify as citizens or non-citizens authorized to work. Agents then directed those who did not self-identify to approach them for interviews—the exact opposite of what the Government told the magistrate judge they would do. (*See* Dkt. No. 33-3, at 1–2 n.2 (noting that the Government sought "judicial authorization of the planned questioning of employees *as described in [its] memorandum and in the application itself*" (emphasis added))). These facts are far from the consensual questioning the Supreme Court authorized in *Delgado*. *See Delgado*, 466 U.S. at 218 (noting that "employees were about their ordinary business, operating machinery and performing other job assignments," and "not prevented by the agents from moving about the factories").

The Government also says the initial suspicion-less seizure of all employees was justified by *Bailey*, in light of the Rule 41 warrant. (Dkt. No. 33, at 15–16). But the Supreme Court has long emphasized that any "exception to the Fourth Amendment rule prohibiting detention absent

probable cause must not diverge from its purpose and rationale." *Bailey*, 568 U.S. at 194; *cf. Soukaneh v. Andrzejewski*, 112 F.4th 107, 119 (2d Cir. 2024) ("[T]he scope of a detention in the context of [an] investigatory stop must be 'carefully tailored to its underlying justification.'" (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015))); *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) (same). And the Government cites no caselaw establishing agents' authority to engage in the employee sorting which occurred during the detention. *Cf. Perez Cruz v. Barr*, 926 F.3d 1128, 1141–46 (9th Cir. 2019) (rejecting, on similar facts, invocation of *Bailey* to "justify using the execution of a search warrant for documents to 'target' for detention, interrogation, and arrest busloads of people who could not otherwise be detained").

### 2.     The Arrest

In any event, the Court need not definitively resolve the above issues. The parties agree that Defendant's arrest and transport to the CBP station must have been authorized by a warrant or supported by probable cause. (*See* Dkt. No. 23-1, at 29–31; Dkt. No. 33, at 20; *see also* Dkt. No. 33-3, at 6–7). Neither warrant here conferred authority to arrest, so agents must have had probable cause. (Dkt. No. 33-2 at 1, 6–10; Dkt. No. 33-5, at 1).

"Probable cause to arrest requires that the totality of facts and circumstances known to the police permit a person of reasonable caution to conclude that there is a 'fair probability' that the person to be seized has committed or is committing a crime." *United States v. Lefebvre*, 117 F.4th 471, 476 (2d Cir. 2024) (quoting *Patterson*, 25 F.4th at 136); *see also Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (quoting *Gates*, 462 U.S. at 232). It "is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *United States v. Pabon*, 871 F.3d 164, 174 (2d Cir. 2017)

(quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)). Although "[t]he standard does not demand certainty," *Gaskin*, 364 F.3d at 457, the evidence "must constitute more than rumor, suspicion, or even a 'strong reason to suspect,'" *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir. 1983) (quoting *Henry v. United States*, 361 U.S. 98, 101 (1959)).

In its opposition, the Government asserts that, taken together, the following facts established probable cause: (1) Defendant's "refusal to produce her immigration documents upon request"; (2) "where [she] had already disobeyed a direct command of an officer to 'stop' and had walked away from that officer"; and (3) "where she did not avail herself of opportunities to identify herself as a citizen or legally authorized worker."[10] (Dkt. No. 33, at 20). Defendant argues that these facts are insufficient. (Dkt. No. 39, at 11–15).

The Government is correct that "nervous, evasive behavior," including flight, "is a pertinent factor in determining reasonable suspicion" and probable cause. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *Jenkins v. City of New York*, 478 F.3d 76, 90 (2d Cir. 2007). But even assuming Defendant fled, (*see* Dkt. No. 39, at 8), that fact is supplied only by her own affidavit. Nothing in the record establishes that it was actually "known to the [arresting agents]" at the time of the arrest. *Lefebvre*, 117 F.4th at 476; *see Terry v. Ohio*, 392 U.S. 1, 21–22 (1968) (requiring that courts assess "the facts available to the officer at the moment of the seizure"). Only one arresting agent has submitted an affidavit in connection with Defendant's motion. (Dkt. No. 33-8). It reflects no interaction with Defendant, much less that he knew she fled. (*See id.*).

To address this deficiency, the Government urges the Court to apply the collective knowledge doctrine and impute the sweeping agents' knowledge to the arresting agents. (Dkt.

---

[10] The Government does not rely on the DHS report's and criminal complaint affidavit's unsupported factual assertions that Defendant admitted at the factory to being from Guatemala and illegally present in the United States.

No. 33, at 18). That "doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, the knowledge of one is presumed shared by all.'" *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (alteration adopted) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772 n.5 (1983)). Thus, an arrest "is permissible where the actual arresting . . . officer lacks the specific information to form the basis for probable cause," but "sufficient information to justify the arrest . . . was known by other [officers] initiating or involved with the investigation." *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001). This "rule exists because, in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation." *Id.* (quoting *United States v. Valez*, 796 F.2d 24, 28 (2d Cir. 1986)).

The Second Circuit, however, has "decline[d] to extend the collective knowledge doctrine to cases where . . . there is no evidence that an officer has communicated his suspicions with the officer conducting the [seizure], even when the officers are working closely together at a scene." *United States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016) (collecting cases). This is consistent with the "touchstone of the Fourth Amendment," reasonableness. *See, e.g.*, *United States v. Ojudun*, 915 F.3d 875, 883 (2d Cir. 2019) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). As the Circuit has explained, "an arresting officer [unaware] of all the underlying facts" might "nonetheless act reasonably in relying on information received by other law enforcement officials." *Colon*, 250 F.3d at 135. But an officer would not act reasonably in arresting a suspect on less than probable cause—betting that, in the meantime, colleagues have independently learned enough information to later justify the arrest. *See id.* at 138.

Here, no evidence reflects that the sweeping officers "communicated [their] suspicions with the" arresting officers. *Hussain*, 835 F.3d at 316 n.8. Thus, the collective knowledge

doctrine does not apply. *Id.* In light of the above, the Court will not consider flight in assessing probable cause.

The remaining facts the Government asserts established probable cause to arrest Defendant are (1) her failure to "avail herself of opportunities to identify herself as a citizen or legally authorized worker" after she was first brought to the break room, and (2) her alleged "refusal to produce her immigration documents upon request" during her interview with the CBP agent. (Dkt. No. 33, at 20). Again, the Government has advanced no evidence that these facts were "known to the [arresting agents]" at the time of Defendant's arrest. *Lefebvre*, 117 F.4th at 476; *Terry*, 392 U.S. at 21–22. No affidavit from any agent who participated in the search reflects any information about Defendant's conduct that day. And agents eventually directed some employees who had left the breakroom back with those who had not, mixing the groups together after all employees were interviewed, but before the arrest. Given the number of employees and the disorganized search and sorting, the Court cannot conclude that the arresting agents were aware of these facts.[11]

Even if it could, taken together, those facts are insufficient to establish probable cause that Defendant had committed, or was committing, a crime or civil immigration offense. *See* 8 U.S.C. § 1357(a). Defendant's failure to self-identify was really, as the Government notes, her "pre-arrest silence." (*See* Dkt. No. 33, at 19 & n.14). Under some circumstances, officers are permitted to consider silence. *See Kolender v. Lawson*, 461 U.S. 352, 366 n.4 (1983) (Brennan, J., concurring); *see also Fitzpatrick v. City of Fort Wayne*, 679 F. Supp. 2d 947, 951–52 (N.D. Ind. 2009). And seemingly "innocent behavior" may, in the context of a particular set of facts,

---

[11] The Government has not invoked the collective knowledge doctrine as to these facts. Even if it had, the Court would not apply the doctrine for the reasons given above as to flight. *See Hussain*, 835 F.3d at 316 n.8.

provide officers a basis to establish probable cause. *See United States v. Delossantos*, 536 F.3d 155, 161 (2d Cir. 2008) (quoting *Gates*, 462 U.S. at 244 n.13).

But there are many reasons why a person in an "intimidating" environment might choose to remain silent.[12] *Cf. United States v. Hale*, 422 U.S. 171, 177 (1975) (discussing the "variety of reasons [which] may influence" an "innocent" person's decision to remain silent "[a]t the time of arrest and during custodial interrogation"); *see also Victory v. Bombard*, 570 F.2d 66, 70 (2d Cir. 1978) ("In most circumstances silence is so ambiguous that it is of little probative force." (quoting *Hale*, 422 U.S. at 176)). One particularly relevant to this case—where employees were detained in the crowded breakroom, and then directed to self-identify—is that "a suspect may not have heard or fully understood the question, or may have felt that there was no need to reply." *Hale*, 422 U.S. at 177. To be sure, "reasonable and prudent" people might expect that most citizens or non-citizens authorized to work would want to self-identify when given the chance. *Pabon*, 871 F.3d at 174. And Defendant's failure to do so might arouse "suspicion, or even a strong reason to suspect," that she was neither a citizen, nor a non-citizen authorized to work. *Fisher*, 702 F.2d at 375 (cleaned up). But that is not enough. *Id.*

The Government argues that Defendant's "refusal to produce her immigration documents upon request" was an additional relevant consideration. (Dkt. No. 33, at 20). But this gloss on Defendant's interaction with the CBP agent is incomplete: the agent asked Defendant two questions—including whether she "*had* documents"—to which she responded only that she

---

[12] The Government states that whether it could, consistent with the Fifth Amendment, introduce evidence of Defendant's pre-arrest silence at trial "is not a live issue." (Dkt. No. 33, at 19 n. 14). It nevertheless cites *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177 (2004), for the proposition that a state's convicting a detainee for failing to identify themself during a *Terry* stop did not violate the Fifth Amendment. (*Id.*). So the Court notes that *Hiibel* is distinguishable from the present case. There, the Fifth Amendment was not implicated because the compelled testimonial communication, disclosing one's name, was not incriminating. *Hiibel*, 542 U.S. at 189–90. The implicit (and arguably compelled) testimonial communication here—Defendant's "de facto" self-identification "as present illegally in some manner," (Dkt. No. 33, at 19)—clearly "presented [a] reasonable danger of incrimination." *Hiibel*, 542 U.S. at 189.

wanted a lawyer. (*See* Dkt. No. 23-16, ¶¶ 15–17 (emphasis added and internal quotation marks omitted)). The Government properly does not argue that Defendant's invocation of her right to counsel, *see Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981), was relevant to probable cause. Instead, it points to 8 U.S.C. § 1304(e). (Dkt. No. 33, at 20). That statute imposes criminal liability on an adult "alien [who fails to] at all times carry with [her] and have in [her] personal possession any certificate of alien registration or alien registration receipt card issued to [her]." *See United States v. Abrams*, 427 F.2d 86, 91 (2d Cir. 1970).

But the CBP agent lacked sufficient information to establish that Defendant had violated § 1304(e). The agent did not know Defendant's name, where she was born, or any other biographical information. All he knew before the interview was that she did not self-identify as a U.S. citizen or authorized worker—in other words, that she had remained silent. Defendant's responses to the agent's questions provided no additional information, only that she wanted a lawyer. The agent thus could not have determined whether Defendant was "a lawfully admitted alien," *Katris v. INS*, 562 F.2d 866, 869 (2d Cir. 1977) (per curiam), to whom a "certificate of alien registration or alien registration receipt card" had been "issued," and who was required to carry such documentation, under § 1304(e). *See United States v. Mendez-Lopez*, 528 F. Supp. 972, 973 (N.D. Okla. 1981); *cf. United States v. Vasquez-Ortiz*, 344 F. App'x 552, 554–55 (11th Cir. 2009) (probable cause of § 1304(e) violation after suspect admitted "that he was from El Salvador and did not have any identification," was found in "a public location known to be a hangout for gangs with illegal alien membership," and had clothes and a tattoo "that indicated gang membership"); *United States v. Castillo-Martinez*, 451 F. App'x 615, 619 n.3 (8th Cir. 2012) (reasonable suspicion of § 1304(e) violation after suspect told agent "that he did not have any identification on his person and that he had been issued a visa").

In sum, no evidence reflects that the arresting agents knew of the facts the Government says established probable cause. And had agents known those facts, Defendant's silence and request for counsel—even in response to a question concerning her "documents"—was in any event insufficient. So the agents subjected her to an unreasonable seizure violative of the Fourth Amendment.

### C.    Suppression

"To enforce the Fourth Amendment's prohibition against 'unreasonable searches and seizures,' [the Supreme Court] has at times required courts to exclude evidence obtained by unconstitutional police conduct." *Utah v. Strieff*, 579 U.S. 232, 234–35 (2016). "[T]he exclusionary rule is a judicially-created mechanism of safeguarding against unreasonable searches and seizures—violations of the Fourth Amendment—primarily through its deterrent effect." *United States v. Hightower*, 950 F.3d 33, 36 (2d Cir. 2020) (per curiam). Defendant asserts that suppression is necessary to achieve meaningful deterrence. (*See* Dkt. No. 23-1, at 34–35; Dkt. No. 39, at 17–18). The Government disagrees and presents additional arguments against suppression. (*See* Dkt. No. 33, at 20–25).

In general, "the exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Strieff*, 579 U.S. at 237 (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)). However, "the significant costs" of the exclusionary rule mandate that the rule apply only "where its deterrence benefits outweigh its substantial social costs" such that suppression is a "last resort" and not a "first impulse." *Id.* at 237–38 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)). For the rule to apply, the police must have "violated the Constitution deliberately, recklessly, or with gross negligence," or the violation must be "the product of recurring or systemic negligence." *United States v. Smith*,

967 F.3d 198, 211 (2d Cir. 2020); *see also United States v. Jones*, 43 F.4th 94, 110–11 (2d Cir. 2022). The rule does not apply to "constitutional violations that are the product of isolated simple negligence, because exclusion in such circumstances will not result in appreciable deterrence of police misconduct." *Smith*, 967 F.3d at 211–12.

Here, the Government first argues that the evidence should not be suppressed because agents relied on the administrative warrant in good faith. (Dkt. No. 33, at 20–21). The good-faith exception ordinarily applies where officers obtained evidence "in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court." *See United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (internal quotation marks omitted). Even assuming the exception could apply here, where the Court has not held the administrative warrant invalid, agents exceeded the contemplated scope of that warrant as described above. More importantly, the exception does not apply because agents did not reasonably rely on the warrant to arrest Defendant. The Government acknowledged that authority to arrest employees did not stem from the warrant. (*See* Dkt. No. 33-3, at 6–7). Rather, arrests required probable cause. (*See id.* at 7).

Next, the Government argues that suppression of identity evidence is unwarranted under *INS v. Lopez-Mendoza*, 468 U.S. 1032 (1984). (Dkt. No. 33, at 21–23). In *Lopez-Mendoza*, the Supreme Court explained that "[t]he 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred." 468 U.S. at 1039–40. But suppression may still occur under this principle following "an egregious violation that was fundamentally unfair." *Almeida-Amaral v. Gonzales*, 461 F.3d 231, 234–35 (2d Cir. 2006).

In any event, the Second Circuit has since clarified that "*Lopez-Mendoza* reaffirmed a long-standing rule of personal jurisdiction; it did not create an evidentiary rule insulating specific

pieces of identity-related evidence from suppression." *Pretzantzin v. Holder*, 736 F.3d 641, 647

(2d Cir. 2013); *see also United States v. Olivares-Rangel*, 458 F.3d 1104, 1112 (10th Cir. 2006)

("[T]he 'identity' language in *Lopez-Mendoza* . . . does not apply to evidentiary issues pertaining

to the admissibility of evidence obtained as a result of an illegal arrest and challenged in a

criminal proceeding."). Defendant here seeks to suppress "specific pieces of identity-related

evidence," *Pretzantzin*, 736 F.3d at 647, so *Lopez-Mendoza* is no bar.[13] (*See* Dkt. No. 23-1, at 7–

8). Instead, the Court must apply the "normal and generally applicable Fourth Amendment

exclusionary rule." *Olivares-Rangel*, 458 F.3d at 1112; *cf. Pretzantzin*, 736 F.3d at 647.

Under that standard, suppression is warranted. The agents' conduct here was, at best,

"grossly negligent." *See Smith*, 967 F.3d at 211–12. The DHS report described above reflects

that agents arrested Defendant based on an admission that, evidently, never occurred. (Dkt. No.

23-9, at 3). Specifically, that report stated that Defendant "freely admitted to being in the United

States illegally" while agents "questioned [her] as to her citizenship and nationality." (*Id.*). But

the Government has presented no evidence to refute Defendant's assertion that agents at the

factory questioned her once (for ten seconds), during which she stated only that she wanted a

lawyer. (*See* Dkt. No. 23-16, ¶¶ 15–17). And as explained above, the record also contains no

evidence that the arresting agents knew, at the time of Defendant's arrest, about any of the

alternative facts the Government now argues established probable cause. Those facts—

Defendant's silence and invocation of her right to counsel—were in any event deficient.

---

[13] The Government also cites *United States v. Adegbite*, 846 F.2d 834, 838–39 (2d Cir. 1988), for the proposition that "the identity of defendants is not suppressible under the exclusionary rule." (Dkt. No. 33, at 23). As the Second Circuit noted in *Pretzantzin*, however, *Adegbite* principally "determined that 'the solicitation of information concerning a person's identity and background does not amount to custodial interrogation prohibited by *Miranda*.'" 736 F.3d at 649 n.8 (quoting *Adegbite*, 846 F.2d at 838). Moreover, the "concerns" underlying this identity exception to exclusion in the *Miranda* context "do not line up well with the circumstances of [Defendant's] constitutional claim that [she was] seized [and questioned] without consent and [arrested] without probable cause." *Id.* So the Court declines to "engraft[] an exception to the protections of the Fifth Amendment onto [her] Fourth Amendment claim[]." *Id.*

Additionally, they developed only after agents engaged in conduct markedly different from that which the Government told the magistrate judge would occur.

These actions are "sufficiently deliberate that exclusion can meaningfully deter [them], and sufficiently culpable that such deterrence is worth the price paid by the justice system." *See Jones*, 43 F.4th at 110–11 (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)). Any objective, "reasonably well[-]trained officer"—aware of the facts known to the arresting agents at the time, or lack thereof—"would have known that the [arrest] was illegal." *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) (quoting *Herring*, 555 U.S. at 145). And "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *Davis v. United States*, 564 U.S. 229, 238 (2011) (quoting *Herring*, 555 U.S. at 144); *see also United States v. Boles*, 914 F.3d 95, 103 (2d Cir. 2019).

Resisting this conclusion, the Government argues that suppression would serve no appreciable deterrent value because Defendant could be rearrested if released. (*See* Dkt. No. 33, at 23–25 (citing *United States v. Navarro-Diaz*, 420 F.3d 581, 588 (6th Cir. 2005))). As an initial matter, assuming the Government is correct, that fact might eliminate the social cost of "setting the guilty free." *See Hudson*, 547 U.S. 591; *see also United States v. Julius*, 610 F.3d 60, 66 (2d Cir. 2010); *United States v. Martinez-Rodriguez*, --- F. Supp. 3d ----, 2025 WL 2355630, at *9, 2025 U.S. Dist. LEXIS 157599, at *23 (N.D.N.Y. July 23, 2025).

In any event, the out-of-circuit case on which the Government relies, *Navarro-Diaz*, is inapposite for three reasons. First, that decision's primary reasoning was based on an interpretation of *Lopez-Mendoza* that the Second Circuit rejected in *Pretzantzin*. *See Navarro-Diaz*, 420 F.3d at 584–88; *Pretzantzin*, 736 F.3d at 646–47 & n.6 (citing *Navarro-Diaz*, 420 F.3d

at 588); *Martinez-Rodriguez*, 2025 WL 2355630, at *8, 2025 U.S. Dist. LEXIS 157599, at *22 (noting same). Second, no "practical problem" like the one in *Navarro-Diaz* exists here. 420 F.3d at 587. As noted above, Defendant is subject to an immigration detainer. (Dkt. No. 23-10). So in suppressing the evidence obtained after her unlawful arrest, the Court would not have "the constable's blunder" enable Defendnant "to continue the commission of an ongoing crime" or civil immigration violation. *Navarro-Diaz*, 420 F.3d at 587 (alteration adopted) (quoting *Lopez-Mendoza*, 468 U.S. at 1047). Finally, even *Navarro-Diaz* contemplated suppression following "egregious violations . . . that might transgress notions of fundamental fairness." *Id.* (quoting *Lopez-Mendoza*, 468 U.S. at 1050).

At its core, "the exclusionary rule is *not an individual right* and applies . . . where it serves the purpose of deterring Fourth Amendment violations *in the future*." *Julius*, 610 F.3d at 66 (alterations adopted and emphasis added) (quoting *Herring*, 555 U.S. at 141); *see also Rosa*, 626 F.3d at 64; *Davis*, 564 U.S. at 236–37 (collecting cases). Good reason exists to deter future conduct of the type that happened here. *Cf. Herring*, 555 U.S. at 143 ("The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct."). Agents arrested Defendant following a mass seizure carried out in a manner materially different from what the Government represented to the magistrate judge—and only after a short interaction with an agent during which she invoked her right to counsel. The Government has put forward no evidence that arresting agents knew of any facts it now says establish probable cause.

Under these circumstances, "[e]xclusion is proper . . . 'to compel respect for the constitutional guaranty.'" *United States v. Bershchansky*, 788 F.3d 102, 114 (2d Cir. 2015) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)). The Government does not dispute

that Defendant's relevant "statements, fingerprints, a photo taken of her, any report of investigation, and the immigration file . . . linked to those fingerprints" are the fruit of her unlawful arrest. (Dkt. No. 23-1, at 8; *see generally* Dkt. No. 33). Accordingly, the Court will suppress that evidence. *See Strieff*, 579 U.S. at 237.

## IV.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to suppress (Dkt. No. 23) is **GRANTED**.

**IT IS SO ORDERED.**

Dated:  <u>December 18, 2025</u>
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge